No. DA 06-0105

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 10

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

THOMAS DUANE RENNAKER,

        Defendant and Appellant.

APPEAL FROM:    The District Court of the Fourth Judicial District,
                        In and For the County of Missoula, Cause No. DC-04-19,
                        Honorable Ed McLean, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Lisa B. Kauffman, Attorney at Law, Missoula, Montana

        For Respondent:

                Honorable Mike McGrath, Attorney General; Micheal S.
                Wellenstein, Assistant Attorney General, Helena, Montana

                Fred Van Valkenburg, County Attorney, Missoula, Montana

                        Submitted on Briefs:  November 14, 2006

                                   Decided:  January 23, 2007

Filed:

                                Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1     Thomas Duane Rennaker appeals from the Fourth Judicial District Court's judgment convicting Rennaker of two counts of incest and sentencing him to prison, and the order denying Rennaker's motion for a new trial. We affirm in part, reverse in part, and remand for re-sentencing.

¶2     We address the following issues on appeal:

¶3     1. Was the evidence sufficient to support the conviction of two counts of incest?

¶4     2. Did the District Court abuse its discretion in denying Rennaker's motion for a new trial alleging jury misconduct?

¶5     3. Did the District Court impose a legal sentence when it based Rennaker's punishment, in part, on his lack of remorse and failure to acknowledge he was wrong?

## BACKGROUND

¶6     On January 7, 2004, the State of Montana charged Thomas Duane Rennaker with two counts of incest. The first count alleged Rennaker had sexual contact and/or intercourse with his seventeen-year-old stepdaughter in 1998. The second count alleged Rennaker had sexual intercourse with his stepdaughter without her consent when she was age eighteen through twenty-two.

¶7     Sherry Munnerlyn had three children before she met Thomas Rennaker—a daughter, S.R. (the oldest, born April 19, 1981), and two sons. Sherry met Rennaker in 1987. In 1989, Sherry and Rennaker married, and Rennaker became the stepfather to her children.

2

¶8 In 1991, Sherry and Rennaker moved into a log cabin a few miles outside of Florence, Montana. Over the next several years, Sherry worked at various jobs in Missoula, and would often be gone until eight or nine o'clock in the evening. Rennaker worked seasonal jobs. He put in irrigation systems in the summer and did odd jobs in the winter. At times, he did not work and was often at home alone with the children. They lived an isolated life with only one neighbor nearby.

¶9 Sherry and Rennaker had a physically and verbally abusive relationship, often displayed in front of the children. Rennaker also verbally abused the children, yelling at them and calling them names. He did not allow the children to have friends. He once threatened to burn the house down if they did not listen to him. S.R. was responsible for cooking, and Rennaker would throw his dinner on the floor for the dogs if he did not like it. Many times throughout the years, Rennaker would kick Sherry and the children out of the house, and Sherry would take them to her parents' house. When things cooled off between Sherry and Rennaker, they would move back to the cabin.

¶10 After being kicked out once again around Thanksgiving time in 2003, Sherry decided to divorce Rennaker. Unbeknownst to Sherry, S.R. and Rennaker had repeatedly had sexual intercourse. Rennaker told S.R. that he was going to tell Sherry that they had been having sex. Because she was afraid that Rennaker would tell Sherry first and twist things around, making it seem like her fault, S.R. immediately told her mom that Rennaker had been having sex with her.

¶11 Sherry called 911, asking for an officer to arrest her husband because he had sex with her daughter. In a statement to police, S.R. described the first time Rennaker had

3

nonconsensual sexual contact with her, stating it started when she was seventeen years old and had continued since then. Based on S.R.'s statement, Rennaker was charged with incest.

¶12 Rennaker was tried by a jury in April of 2005 and convicted of both counts of incest. Rennaker then filed a motion for a new trial based on juror misconduct. He alleged that he did not have a fair and impartial trial because two female jurors failed to disclose in voir dire that they had either been a victim of a sexual crime or knew someone who was a victim of a sexual crime. The District Court denied the motion.

¶13 The court sentenced Rennaker to twenty years on each count, with the last fifteen years suspended, to run concurrently. The court stated at the sentencing hearing that the prison time was given, in part, due to Rennaker's lack of remorse and failure to acknowledge his conduct was wrong.

¶14 Rennaker appeals from the judgment and from the court's order denying his motion for a new trial.

**DISCUSSION**

¶15 **ISSUE 1: Was the evidence sufficient to support the conviction of two counts of incest?**

¶16 The standard of review of sufficiency of the evidence on appeal is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Bailey*, 2003 MT 150, ¶ 7, 316 Mont. 211, ¶ 7, 70 P.3d 1231, ¶ 7 (2003). The trier of fact, a jury in this case, determines the credibility of witnesses and the weight to

4

be given to their testimony because it is in the best position to do so. *State v. Bauer*, 2002 MT 7, ¶ 15, 308 Mont. 99, ¶ 15, 39 P.3d 689, ¶ 15; *State v. Booke*, 178 Mont. 225, 234, 583 P.2d 405, 410 (1978). The jury's determination with regard to disputed questions of fact and credibility will not be disturbed on appeal. *Bauer*, ¶ 15. If evidence conflicts, it is within the province of the jury to determine which evidence will prevail. *Bauer*, ¶ 15. A conviction for a sex offense may be based entirely on the uncorroborated testimony of the victim. *Bauer*, ¶ 15.

¶17 Rennaker argues that the State failed to provide sufficient evidence that proved beyond a reasonable doubt that he was guilty of incest. The offense of incest is defined in § 45-5-507(1), MCA, as follows:

> A person commits the offense of incest if the person knowingly marries, cohabits with, has sexual intercourse with, or has sexual contact, as defined in 45-2-101, with an ancestor, a descendant, a brother or sister of the whole or half blood, or any stepson or stepdaughter. The relationships referred to in this subsection include blood relationships without regard to legitimacy, relationships of parent and child by adoption, and relationships involving a stepson or stepdaughter.

Consent is a defense to incest with a stepson or stepdaughter, but consent is ineffective if the victim is less than eighteen years old. Section 45-5-507(2), MCA.

¶18 In the first count of incest, the State charged Rennaker with having sexual contact and/or sexual intercourse with S.R. in 1998 when she was seventeen years old. S.R., the victim, testified that she was seventeen years old when Rennaker first had sexual contact with her and began to have sexual intercourse with her. She told the jury of the first sexual incident with Rennaker when she was seventeen. It was a warm summer night and she was sleeping outside. Rennaker came outside after it got dark and sat down beside

5

her. He rubbed her legs and breasts, then put his hand under her shorts and put his fingers inside her. After about five minutes, he got up and left. She stated that she was in shock when it happened because it was so unexpected; she did not say anything to him because it happened so fast. She was scared and confused. She said the next day he gave her five dollars, which she figured meant she needed to be quiet. She did not tell anyone, and she felt like she did not have anyone she could tell. She testified that her mother was working as a salesperson at a car lot in Missoula at the time of this incident. Sherry's job at the car lot was one of a series of three jobs that she held outside the home after the family moved to the cabin.

¶19 S.R. told the jury that the next incident happened about a month later. She had been sick and was lying on Sherry and Rennaker's bed. Rennaker came upstairs to the bed, took off S.R.'s pants and his pants, laid on top of her, put his penis inside her, then stopped before he ejaculated. She told the sheriff's deputy this occurred approximately twice every three or four weeks and that Rennaker had sex with her several more times before she turned eighteen.

¶20 At one point when S.R. was seventeen, she left home and went to her grandparents' house. Sherry and Rennaker found her there, but she refused to go home. When a sheriff's deputy responded, S.R. did not tell the deputy why she refused to go home. Because she was only seventeen, the deputy told her she had to go home with her parents. S.R. testified that Rennaker had sexual intercourse with her prior to this incident.

6

¶21    Rennaker challenges the sufficiency of the evidence of this count of incest, stating that S.R. was over the age of eighteen when their sexual relationship began.  Rennaker points to the fact that S.R. said she was "around five years old . . . quite young," when Rennaker became her stepfather, when in fact, Sherry and Rennaker married when S.R. was eight years old.  From this, Rennaker concludes that S.R.'s testimony as to her age at the time of the first sexual contact was not credible.  Secondly, S.R. testified that her mom was working at the car lot at the time of the first sexual contact.  Sherry started working at the car lot in 2001 when S.R. was twenty years old.  Thus, Rennaker concludes that S.R. must have been twenty years old at the time of the first contact.

¶22    The jury weighed this testimony and the credibility of the witnesses and determined that S.R. was seventeen at the time of the first sexual encounter with her stepfather.  Viewing the evidence in the light most favorable to the prosecution, we conclude that S.R.'s testimony provided sufficient evidence from which the jury could conclude S.R. was seventeen years old at the time Rennaker had his first sexual contact with her.  Based on her testimony, the jury could have found him guilty of incest beyond a reasonable doubt.

¶23    In the second count of incest, the State charged Rennaker with having sexual intercourse with S.R. without her consent from when S.R. was age eighteen through twenty-two. Rennaker asserts that S.R. consented to the sexual encounters.  S.R. testified that when she turned eighteen, Rennaker had sexual intercourse with her about every couple weeks.  She testified that after sex, she would lay there and cry, and that she did not think she had a choice in the matter; Rennaker was in charge.  She testified that

7

sometimes she told Rennaker no, she did not want to have sex, and sometimes he would leave her alone, but other times, he would have sex with her anyway. Sometimes she would not say anything to him, and sometimes she told him it was okay even though she did not want it. She said she never told anyone what was happening. She said he never threatened her or beat her, but she was afraid if she told anyone, Rennaker would hit her mother or throw her mother out of the house.

¶24 Rennaker testified at trial that S.R. initiated the sexual contacts. He stated the first time they had sex was when he was lying in his bed and S.R. came upstairs and got into bed with him. He stated they would most often have sex when no one was around. Sherry was at work at the car lot, the boys were at school, and since S.R. had already graduated, they were alone. Rennaker stated that he never threatened S.R., never told her not to tell anyone, and that she never told him she did not want to have sex. He testified that he had a good relationship with S.R. and that he even got her a job at the irrigation company where he worked.

¶25 Rennaker had his employer, the neighbor, and his sister's friend testify on his behalf. His employer testified that in the instances he saw Rennaker and S.R. working together, they seemed to have more of a "boyfriend-girlfriend" relationship. Rennaker's neighbor testified that he saw Rennaker and S.R. together about once a week, and they seemed to have a friendly happy relationship. Rennaker's sister's friend testified that she was at their cabin once, and she heard S.R. say "I wish the bitch would get off the mountain, and leave us alone." From this statement, she assumed that S.R. wished Sherry would leave S.R. and Rennaker alone.

¶26    Again, the jury weighed this testimony and the credibility of the witnesses and determined that S.R. did not consent to sexual intercourse with her stepfather. Viewing the evidence in the light most favorable to the prosecution, we determine there was sufficient evidence from which the jury could conclude that S.R. did not consent to sexual intercourse with Rennaker, and thus he was guilty of incest.

¶27    We affirm the District Court's judgment finding Rennaker guilty of two counts of incest.

¶28    **ISSUE 2: Did the District Court abuse its discretion in denying Rennaker's motion for a new trial alleging jury misconduct?**

¶29    It is within the discretion of the district court to grant or deny a motion for a new trial, and the district court's determination will not be overturned unless the defendant demonstrates he was deprived of a fair and impartial trial. *State v. McNatt*, 257 Mont. 468, 471, 849 P.2d 1050, 1052 (1993). This Court will reverse a district court's decision regarding a juror's fitness to serve only when the district court abused its discretion. *State v. Hatten*, 1999 MT 298, ¶ 28, 297 Mont. 127, ¶ 28, 991 P.2d 939, ¶ 28 (citations omitted). The trial court is in the best position to observe the jurors and to decide the potential for prejudice when allegations of juror misconduct are raised; therefore, the trial court has significant latitude when ruling on these matters, and its determination is given considerable weight by this Court. *Hatten*, ¶ 28 (citation omitted). This Court will defer to that determination absent a showing of prejudice. *Hatten*, ¶ 28 (citation omitted).

¶30    The state and federal constitutions guarantee a defendant's rights to a fair and impartial jury. Mont. Const. art. II, § 24; U.S. Const. Amend. VI. Rennaker asserts that

9

he was deprived of this right when, during voir dire, two jurors failed to disclose their experience with sexual crimes, but then disclosed this information during deliberations.

¶31     At the start of jury selection, the court informed the jury pool that the case involved an allegation of incest, and asked if that fact alone would make anyone unfit to be a juror. There was no response. The court then inquired: "Has anybody had a family member, or themselves, or a close friend, suffer from a sexual crime?" When some of the jurors answered affirmatively, the court then asked: "Okay, now, rather than call on each of you, as individuals, I would ask you: Does anyone think that that experience would interfere with your ability to sit as a juror?" Five jurors answered affirmatively to this question. When questioned further, all five of these jurors were excused. Since jurors Mary Diane Schmautz and Schery Hamilton did not respond affirmatively to the court's follow-up question, they were not excused.

¶32     Juror Hamilton was not initially seated in the jury box. When a number of jurors were excused, she took a seat in the jury box. The State then asked Hamilton if there was anything that she heard during voir dire that she would have responded to and was there anything about her state of mind that would be important for the attorneys to know about. Her response was: "You have to know the facts, and you have to judge it appropriately, as far as the law." Later, defense counsel directly posed a question to Schmautz, asking her if she could put aside any natural inclination she may have to believe Rennaker did something, and presume Rennaker was innocent. Schmautz's response was: "Well, the way I look at it, to be a juror, you have to put aside your own basic prejudices, and look

10

at only the facts and the instructions from the Judge." Schmautz and Hamilton both served as jurors.

¶33 After the trial, two jurors came forward with affidavits stating that shortly after deliberations began, two female jurors, identified as Schmautz and Hamilton, disclosed that they had been sexually abused or knew someone that had been sexually abused. One affiant stated: "It was very apparent that these two jurors were not impartial and that prior to even reviewing the evidence, they both made it clear that they would not vote for a not guilty verdict." Another affiant stated of one of the women: "It was quite apparent through deliberations that she viewed the evidence through the perceptions of her own experience." Rennaker filed a motion for a new trial based on these affidavits.

¶34 Schmautz and Hamilton provided their own affidavits in support of the State's opposition to the motion. They stated that they did not conceal information during voir dire, they appropriately answered questions asked of them, and they decided the case impartially based on the evidence and jury instructions given them. The District Court denied the motion for a new trial because there was no evidence that one or more jurors on the panel would have found the defendant not guilty but for the presence or undue pressure from jurors Schmautz and Hamilton.

¶35 In his original motion for a new trial, Rennaker did not challenge the validity of the verdict, but rather, asserted that Hamilton and Schmautz were not competent to sit on the jury because of their failure to disclose past experience with sexual abuse. Thus, he concluded he was denied his constitutional right to twelve impartial jurors. A juror's nondisclosure of information may constitute misconduct resulting in a denial of the

11

defendant's right to a fair and impartial jury if the juror's nondisclosure amounts to intentional concealment. *Hatten*, ¶ 29 (citation omitted). Where a juror's nondisclosure does not amount to intentional concealment and no further evidence of bias is proven, there is no error. *Hatten*, ¶ 29 (citation omitted).

¶36 Rennaker asserted that Schmautz and Hamilton intentionally concealed information during voir dire. He stated that Schmautz and Hamilton did not respond when the court asked whether any potential juror or anyone they knew had been victims of a sexual crime. The trial transcript does not contain any record of who did or did not respond. The record is clear that Schmautz and Hamilton did not respond affirmatively to the court's follow-up question regarding whether such an experience would hinder their ability to serve as a juror. Further, both jurors made statements during voir dire that demonstrated their understanding of the need to remain impartial, follow the law given to them, and decide the case based on the evidence. Both jurors took an oath to well and truly try the matter in issue and render a true verdict according to the evidence. Section 25-7-207, MCA. Finally, both jurors signed sworn affidavits that they were honest in their answers to the court and followed the law in deliberations.

¶37 The affidavits of the two other jurors generally state that the two women were not impartial, viewed the evidence through their own experience, and made it clear they would not vote for a not guilty verdict. The affidavits, however, do not provide specific statements demonstrating impartiality, nor do they explain how the statements that the women would not vote for a not guilty verdict were related to their own experiences with

sexual abuse. Further, the affidavits do not assert that the affiants or other jurors were influenced to vote guilty based on Hamilton's or Schmautz's statements.

¶38    There is nothing in the record indicating that Hamilton and Schmautz intentionally concealed information from the court during voir dire. Where there is no intentional concealment of information, there must be other evidence of bias in order to show the court erred in denying Rennaker's motion for new trial. Finding no other evidence of bias, we hold the District Court did not abuse its discretion in denying Rennaker's motion for a new trial.

¶39    On appeal, Rennaker presents a different legal theory. Rather than framing the issue as a juror competency question based on nondisclosure, Rennaker now contends that the question is not whether the jurors' failure to disclose prior sexual abuse was inadvertent or unintentional. Instead, Rennaker argues on appeal that the question is whether the disclosure during deliberations affected the two jurors' impartiality or contaminated the jury pool. In his appellate argument, he relies on cases that discuss external influences on the jury that may have led to unfair convictions. Based on our longstanding rule that we will not discuss new legal theories on appeal, we will not consider Rennaker's new argument. *State v. Courville*, 2002 MT 330, ¶ 5, 313 Mont. 218, ¶ 5, 61 P.3d 749, ¶ 5.

¶40    **ISSUE 3: Did the District Court impose a legal sentence when it based Rennaker's punishment, in part, on his lack of remorse and failure to acknowledge he was wrong?**

13

¶41    This Court reviews a sentence for legality only. *State v. Shreves*, 2002 MT 333, ¶ 8, 313 Mont. 252, ¶ 8, 60 P.3d 991, ¶ 8.

¶42    Rennaker argues that the District Court violated his Fifth Amendment right against self-incrimination when the court based his sentence, in part, on Rennaker's failure to show remorse or admit that his conduct was wrong. The pre-sentence investigation report recommended that Rennaker receive a twenty-year sentence with all time suspended because he posed a low risk of recidivism. The court sentenced Rennaker to twenty years in prison on each count, with the last fifteen years suspended, to run concurrently. At the hearing, the court asked Rennaker if there was anything he would like to say, to which Rennaker said no. The court then stated: "The Court makes some specific findings concerning your behavior. First, Mr. Rennaker, not only do you not have any remorse for what has occurred, you don't even acknowledge that it's wrong. For that reason, and that reason, in and of itself, you should be subjected to prison." The court further stated: "And finally, as the Court stated earlier, what bothers the Court more than anything is Mr. Rennaker does not even possess the judgment at the present time to feel what he has done is wrong."

¶43    In the written judgment, the court gave the following reasons for ruling as it did:

1. It conforms to the Plea Agreement and Pre-sentence Investigation Report.
2. The Court considered the Defendant's lack of remorse.
3. The commitment will not create an undue hardship on the defendant or his family.
4. This type of conduct demands some punishment.

14

¶44    In *State v. Imlay*, 249 Mont. 82, 813 P.2d 979 (1991), this Court vacated a sentence because it violated the defendant's constitutional right to remain silent.   In *Imlay*, the defendant was convicted of sexual assault and given a suspended sentence. *Imlay*, 249 Mont. at 84, 813 P.2d at 980.  One of the conditions of the suspended sentence was that Imlay had to complete a sexual therapy program.  *Imlay*, 249 Mont. at 84, 813 P.2d at 981.  In order to complete the sexual therapy program, Imlay had to admit that he was guilty of the crime of which he was charged and convicted, which he refused to do. *Imlay*, 249 Mont. at 85-86, 813 P.2d at 982.  Imlay's suspended sentence was revoked and he was ordered to serve five years in prison.  *Imlay*, 249 Mont. at 86, 813 P.2d at 982.  Thus, Imlay was being subjected to punishment that he would not be subjected to if he were to admit his guilt.  *Imlay*, 249 Mont. at 90, 813 P.2d at 985.  This Court held that a district court is prohibited from "augmenting a defendant's sentence because he refuses to confess to a crime or invokes his privilege against self-incrimination."   *Imlay*, 249 Mont. at 91, 813 P.2d at 985.

¶45    This Court then addressed the issue of whether it is a violation of a defendant's constitutional right against self-incrimination to base a sentence in part on a defendant's failure to show remorse or accept responsibility for the crime.  *Shreves*, ¶ 9.  In *Shreves*, the defendant testified at trial, but did not speak on his own behalf at his sentencing hearing.  Counsel indicated that Shreves maintained his innocence.  *Shreves*, ¶ 4.  When the court sentenced Shreves, it stated that it did so, in part, because of the defendant's failure to show remorse or responsibility.  *Shreves*, ¶ 7.  The court asked Shreves if he wanted to say anything, and Shreves declined.  *Shreves*, ¶ 7.  The court stated: "as we sit

15

here, you've given us nothing as to why this happened. So what we've got is what appears to be the premeditated killing of an individual with no remorse or responsibility shown on your part." *Shreves*, ¶ 7. We noted that a district court can consider lack of remorse as a basis for a sentence, but cannot punish a defendant for refusal to admit guilt. *Shreves*, ¶ 19. The district court interpreted Shreves' silence at sentencing as lack of remorse, and sentenced him based on his refusal to admit guilt. *Shreves*, ¶ 20. The rule we pronounced in *Shreves* was: "a sentencing court may not draw a negative inference of lack of remorse from the defendant's silence at sentencing where he has maintained, throughout the proceedings, that he did not commit the offense of which he stands convicted—i.e. that he is actually innocent." *Shreves*, ¶ 22. We concluded Shreves' right against self-incrimination was violated when the court sentenced him based in part on Shreves' refusal to admit his crime and show remorse at sentencing. *Shreves*, ¶ 24.

¶46 We addressed this issue again in *State v. Cesnik*, 2005 MT 257, 329 Mont. 63, 122 P.3d 456. In *Cesnik*, the defendant testified at trial but not at his sentencing hearing. *Cesnik*, ¶ 10. He did not expressly invoke his right to remain silent, but he did maintain that he was innocent. *Cesnik*, ¶ 21. The District Court based its sentence largely on the fact that Cesnik maintained his innocence even after being convicted of the crime. *Cesnik*, ¶ 24. This Court determined that an admission of guilt by the defendant, when he still had a right to appeal his conviction, "would have undermined his constitutionally protected right not to incriminate himself and rendered his appeal meaningless." *Cesnik*, ¶ 24. We held that "a sentencing court may not punish a defendant for failing to accept

16

responsibility for the crime when that defendant has expressly maintained his innocence and has a right to appeal his conviction." *Cesnik*, ¶ 25.

¶47 Before we turn to the issue of whether the court in the instant case based its sentence on Rennaker's refusal to confess to the crime or admit guilt, we must determine three preliminary matters important to an appeal of this nature. *Shreves*, ¶ 11. First, we must determine whether Rennaker invoked his right to remain silent or maintained his innocence. *Shreves*, ¶ 11; *Cesnik*, ¶ 21. In *Cesnik*, the defendant did not expressly invoke his right to remain silent; rather he testified at trial and maintained his innocence. *Cesnik*, ¶ 21. Similarly in this case, Rennaker did not expressly invoke his right to remain silent. He testified at both his trial and the sentencing hearing (his testimony at the sentencing hearing was for the purpose of identifying a photograph) and maintained his innocence. He continued to assert after the trial that his sexual contact with S.R. was consensual and occurred only after she was twenty years old.

¶48 Secondly, if there is a conflict between the oral pronouncement of sentence and the subsequent written sentence, the oral pronouncement of sentence controls. *Shreves*, ¶ 12 (citing *State v. Lane*, 1998 MT 76, ¶ 40, 288 Mont. 286, ¶ 40, 957 P.2d 9, ¶ 40). The oral pronouncement of the sentence in this case varies slightly from the later written judgment, namely that in the oral pronouncement of the sentence, the court made clear the prison time was based on Rennaker's lack of remorse and his failure to acknowledge that his conduct was wrong. The written judgment merely stated the court considered Rennaker's lack of remorse. Thus, the oral pronouncement of judgment is controlling to the extent of this conflict or omission.

17

¶49 Finally, we must look at the evidence the court used to determine the sentence in this case. *Shreves*, ¶ 13. "[A] sentencing court can consider any evidence relevant to a defendant's sentence, including evidence relating to the crime, the defendant's character, background history, mental and physical condition, and any other evidence the court considers to have probative force." *Shreves*, ¶ 13 (citing *State v. Collier*, 277 Mont. 46, 63, 919 P.2d 376, 387 (1996)). While a court cannot sentence a defendant or augment a sentence based on a defendant's refusal to confess to a crime, a court can sentence a defendant based on lack of remorse. *Shreves*, ¶ 20. In this case, the court reviewed the pre-sentence investigation report. The court heard testimony from the victim's family that Rennaker continued to try to contact the victim, that the victim feared Rennaker, and that Rennaker blamed the victim and the victim's mother for the situation. The court heard closing arguments at trial that asserted that Rennaker's actions were not only legally wrong, but morally wrong based on the fact that S.R. was his stepdaughter. The court heard Rennaker admit at trial that he had sex with S.R., but maintain he was not guilty of incest because S.R. was twenty years old when it started and that it was consensual.

¶50 In this case, the District Court clearly relied on Rennaker's lack of remorse and failure to acknowledge his conduct was wrong as a basis for sentencing him to prison. In fact, the court stated that this was reason enough to send him to prison. The question, then, is whether the District Court inferred the lack of remorse from Rennaker's silence at sentencing when he declined the court's invitation to offer an explanation. The court was looking for an acknowledgment of guilt or remorse, and in response to Rennaker's

18

silence, commented that "Rennaker does not even possess the judgment at the present time to feel what he has done is wrong." In order to express remorse or acknowledge that his conduct was wrong, Rennaker would have had to break his silence and admit guilt—contrary to his assertion of innocence and right to appeal.

¶51 If a court chooses to sentence a defendant based upon lack of remorse, it cannot infer lack of remorse from a defendant's silence. Rather, it must point to affirmative evidence in the record demonstrating lack of remorse. For example, the court can consider evidence as to the manner of the commission of the offense or admissible statements made by a defendant pre-trial, at trial, or post-trial. *Shreves*, ¶ 21.

¶52 Here, the District Court did not tie its finding of lack of remorse to any specific evidence or statements made by Rennaker. Rather, it violated Rennaker's right against self-incrimination when, based on Rennaker's silence, it drew a negative inference of lack of remorse. We held in *Cesnik* that "a sentencing court may not punish a defendant for failing to accept responsibility for the crime when that defendant has expressly maintained his innocence and has a right to appeal his conviction." *Cesnik*, ¶ 25. The District Court did just that when it imposed a sentence based, in large part, on Rennaker's silence and failure to express remorse or acknowledge that his conduct was wrong.

¶53 Rennaker also argues in his appeal that the other findings in the District Court's judgment were inappropriate bases for the sentence. However, Rennaker provides no legal authority to support this argument, and thus we need not consider it. Mont. R. App. P. 23(a)(4); *State v. Hicks*, 2006 MT 71, ¶ 22, 331 Mont. 471, ¶ 22, 133 P.3d 206, ¶ 22.

19

¶54    The judgment of the District Court is affirmed on Issues 1 and 2. We reverse the imposition of sentence and remand for re-sentencing on Issue 3 consistent with this Opinion.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER

Justice Jim Rice concurring.

¶55    I concur with the Court's resolution of all issues, but write separately on Issue 3.

¶56    A defendant's attitude, personality, demeanor and the respect which he appears to hold for society in general and individuals in particular are factors which sentencing judges consider, and should consider, in crafting the appropriate sentence. During sentencing, a courtroom may be filled with the sights and sounds of human pain and suffering, offered by those who knew or lived with and around a defendant. What is the defendant's reaction to this pain and suffering? I submit that a sentencing judge can and should gain insight into a defendant's character and potential for future rehabilitation by observing the defendant's reaction to the human suffering going on around him. Volumes are spoken about the person's character who cannot be "remorseful" about human suffering, whatever its cause. A person who cares nothing about those around

him lacks a moral compass and is a dangerous person indeed and who, for the protection of society, should be supervised or imprisoned. Such an observation—that is, whether a defendant sees and understands the devastation experienced by those around him—is an issue separate and apart from guilt or innocence.

¶57    I believe that this assessment of character necessarily includes a sentencing court's observation of the defendant's nonverbal reactions and behavior. What a defendant fails to do often speaks as loudly as his or her affirmative actions. A defendant's failure to "break his silence" about the pain or devastation around him is, in my view, an appropriate factor for the sentencing court to consider and from which to draw a conclusion that the defendant has or feels no remorse for those around him. If the defendant's conviction is upheld on appeal, then the sentence will be implemented, and thus, these factors must be considered at the moment of sentencing. There is plenty of room in the law for the judge to do this while at the same time preserving the defendant's right against self-incrimination, to maintain his innocence and to challenge the guilty verdict on appeal. Likewise, there is room for a defendant to acknowledge the pain in those around him—if he sees it—and still maintain that he did not commit the crime. Consideration of these nonverbal factors should be added to the list of permissible sentencing considerations set forth in ¶ 49 of the Court's opinion and, to this degree, our statement in *Shreves* that "a sentencing court may not draw a negative inference of lack of remorse from the defendant's silence at sentencing" when he has maintained his innocence should be clarified. *Shreves*, ¶ 22.

¶58 The sentencing court properly considered some of these factors, but I must concede that the court then went beyond that by stating "not only do you not have any remorse for what occurred, you don't even acknowledge that it is wrong. For that reason, and that reason, in and of itself, you should be subjected to prison." While it was appropriate, for the reasons discussed herein, for the sentencing court to infer lack of remorse from Rennaker's silence, sentencing him for failure to acknowledge that his conduct was wrong necessarily sentences him for failing to admit to the charge.[1] Thus, the sentencing court crossed a line into the impermissible, running afoul of *Cesnik*'s instruction that "a sentencing court may not punish a defendant for failing to accept responsibility *for the crime*." *Cesnik*, ¶ 25 (emphasis added). For that reason, Rennaker must be resentenced.

/S/ JIM RICE

Justice John Warner concurring.

I join in the concurrence of Justice Rice. It is incumbent upon a sentencing judge to choose his or her words carefully.

/S/ JOHN WARNER

---

[1]Although having sex with a stepdaughter may be morally reprehensible, Rennaker claimed that the relationship had not started until his stepdaughter had reached the age of eighteen, at which point the conduct would not have been forbidden under the law.