

DA 07-0148

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2008 MT 419

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

CODY CLARK,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fifth Judicial District,
In and For the County of Jefferson, Cause No. DC-04-1957
Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jack H. Morris; Jardine, Morris & Tranel, PLC; Whitehall, Montana

      For Appellee:

          Hon. Mike McGrath, Montana Attorney General; Jonathan M. Krauss,
Assistant Attorney General; Helena, Montana

          Matthew C. Johnson, Jefferson County Attorney; Boulder, Montana

Submitted on Briefs:  May 21, 2008

Decided:  December 16, 2008

Filed:

_____
                    Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellant Cody Clark (Clark) was convicted of criminal possession of dangerous drugs, a felony, driving with a suspended/revoked license, a misdemeanor, and failure to carry liability insurance, a misdemeanor, after a jury trial in the Fifth Judicial District Court, Jefferson County. Clark appeals the District Court's order denying his motion to suppress evidence and the resulting jury verdict. We affirm.

¶2 We address the following issues on appeal:

¶3 1. Did the District Court err by denying Clark's motion to suppress evidence obtained following law enforcement's stop of Clark's motor vehicle and his consent to search the vehicle, for one of the following reasons?

    a. No particularized suspicion justified the stop;

    b. Clark was not given *Miranda* warnings;

    c. The interrogation and search exceeded the scope of the stop;

    d. Clark's consent to the search was inadequate;

    e. Clark requested but was denied counsel.

¶4 2. Did the District Court abuse its discretion by excluding evidence of Clark's negative urinalysis test obtained six days after his arrest?

¶5 3. Did sufficient evidence support the jury's verdict convicting Clark of criminal possession of dangerous drugs?

¶6 4. Did the District Court abuse its discretion by admitting the testimony of a pharmacist, Tammy Cox, without conducting a *Daubert* hearing?

## FACTUAL AND PROCEDURAL BACKGROUND

¶7 Clark was driving a 1991 green Ford Explorer on the night of August 9, 2004, when he was pulled over by Montana Highway Patrol Trooper David Gleich (Trooper Gleich). Trooper Gleich pulled Clark over after receiving a cell phone call from his brother, Deputy Sheriff Robert Gleich (Deputy Gleich), notifying him that a domestic disturbance had been reported in Basin, Montana, between Clark and the passenger in his vehicle, Robin Wing, and that they were believed to be traveling north on Interstate 15, south of Helena. Deputy Gleich also notified Trooper Gleich that neither Clark nor Wing had a valid driver's license, having interacted with both individuals two weeks prior, and that Clark might be in possession of a firearm. Upon pulling Clark over, Trooper Gleich established that Clark's driver's license was in fact suspended and the vehicle was not insured. Trooper Gleich asked Clark to exit the vehicle, then handcuffed Clark and placed him in the back of the patrol car in order to separate Clark from Wing and better investigate the alleged disturbance. Clark had a cut and dried blood on his hand. As he was being led to Trooper Gleich's patrol car, Clark yelled to Wing, "Call the attorney now. This is harassment."

¶8 When Trooper Gleich returned to Clark's vehicle and questioned Wing about the alleged disturbance, she was upset that she and Clark had been pulled over and denied that there was any disturbance. She assured Trooper Gleich she was unharmed. She and Clark both maintained that the cut on Clark's hand was from cleaning up broken glass. Deputy Gleich arrived shortly thereafter, and also checked with Wing to make sure she

3

was okay before questioning Clark about the alleged disturbance. Deputy Gleich also asked whether there was a weapon in the vehicle. Clark responded that there was and gave Deputy Gleich permission to locate a .45 caliber handgun, which he did. Upon returning to the patrol car, Deputy Gleich asked Clark for permission to search the rest of the vehicle and Clark consented. Deputy Gleich and Trooper Gleich then located five prescription drug pills (one brand name Oxycontin, three generic Darvocet, one generic Vicodin) in bindles in the backseat of the vehicle, for which Clark admitted that he did not have prescriptions. The phrase "Stay High" was written on one of the bindles along with a picture of a balloon. Clark was arrested for driving with a suspended license and failure to carry proof of insurance. He was later charged with possession of dangerous drugs.

¶9 The green Ford Explorer Clark was driving did not belong to him, but rather had been loaned to him for the summer by his employer, Teresa Hecker (Hecker). Clark worked for Hecker's fire suppression company and was given Hecker's vehicle so that he could get to fires quickly when he was needed. However, Clark treated and used the vehicle as his own and let others borrow the vehicle throughout the summer. Unbeknownst to Hecker, for example, Clark had loaned Hecker's vehicle to another individual, Judy Piper (Piper), for over a month of the summer, trading it for Piper's 2003 Chevy Trailblazer to prevent the Trailblazer from being repossessed. Piper was a retired military veteran and had prescriptions for Oxycontin, Darvocet, and Vicodin. A few days prior to being pulled over, Wing and Clark had also helped Piper move from Basin to

4

Butte using Hecker's vehicle. After helping Piper move, Clark once again had possession of the Ford Explorer for the remainder of the summer, although some of Piper's possessions may have remained in the back seat.

¶10 Prior to trial, Clark moved to suppress the evidence seized and statements made to law enforcement after he was stopped. The District Court denied Clark's motion to suppress, concluding that particularized suspicion justified the investigative stop and that Clark had validly consented to a search of the vehicle. At the request of the State, the District Court excluded evidence of a negative drug urinalysis test Clark took six days after his arrest. The District Court concluded that such evidence was not probative of whether Clark possessed dangerous drugs on the day of his arrest. Finally, the District Court denied Clark's request for a *Daubert* hearing on the testimony of the State's pharmaceutical expert, Tammy Cox (Cox), regarding identification of the prescription pills found in Clark's vehicle. According to Clark, identification of prescription pills only by visual reference to numbers printed on the pills, and not by chemical analysis of their contents, was "novel scientific evidence." The District Court apparently did not rule on the motion but allowed Cox to testify at trial.

¶11 A jury found Clark guilty of criminal possession of dangerous drugs, driving with a suspended license, and failure to carry liability insurance. Clark appeals.

**STANDARD OF REVIEW**

¶12 We review a district court's denial of a motion to suppress to determine whether its findings of fact were clearly erroneous and whether it correctly applied those findings

5

as a matter of law. *State v. Graham*, 2007 MT 358, ¶ 10, 340 Mont. 366, ¶ 10, 175 P.3d 885, ¶ 10. "Findings of fact are clearly erroneous when they are not supported by substantial credible evidence, the district court has misapprehended the effect of the evidence, or a review of the record leaves this Court with the conviction that a mistake has been committed." *Graham*, ¶ 10.

¶13 We review a district court's evidentiary rulings for an abuse of discretion. *State v. Ayers*, 2003 MT 114. ¶ 24, 315 Mont. 395, ¶ 24, 68 P.3d 768, ¶ 24. A district court is vested with great latitude in ruling on the admissibility of expert testimony. *Ayers*, ¶ 35.

¶14 The standard of review of sufficiency of the evidence on appeal is whether, upon viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Rennaker*, 2007 MT 10, ¶ 16, 335 Mont. 274, ¶ 16, 150 P.3d 960, ¶ 16. The trier of fact is in the best position to determine the credibility of witnesses and the weight to be given to their testimony, and its determination with regard to disputed questions of fact and credibility will not be disturbed on appeal. *Rennaker*, ¶ 16.

## DISCUSSION

¶15 **1. Did the District Court err by denying Clark's motion to suppress evidence obtained following law enforcement's stop of Clark's motor vehicle and his consent to search the vehicle?**

*a. Particularized Suspicion*

¶16 Clark argues that Trooper Gleich did not have a sufficient particularized suspicion to pull over Clark's vehicle for an investigative stop. According to Clark, neither

6

Trooper Gleich nor Deputy Gleich was justified in stopping Clark's vehicle because the domestic violence reported to police was alleged to have occurred in Basin, Montana, forty miles from where Trooper Gleich ultimately stopped Clark's vehicle. In addition, Clark argues Trooper Gleich was simply responding to his brother's phone call, not to specific vehicle information provided by dispatch, and therefore Trooper Gleich did not have sufficient information to justify stopping Clark's vehicle.

¶17 "To justify an investigative stop, an officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *State v. Martinez*, 2003 MT 65, ¶ 21, 314 Mont. 434, ¶ 21, 67 P.3d 207, ¶ 21 (citations omitted). Thus, to prove the existence of a particularized suspicion justifying an investigative stop of a vehicle, the State must show: (1) objective data from which an experienced police officer can make certain inferences; and (2) a resulting suspicion that the occupant of the vehicle is or has been engaged in wrongdoing or was a witness to criminal activity. *Martinez*, ¶ 22 (citing *State v. Gopher*, 193 Mont. 189, 194, 631 P.2d 293, 296 (1981)). This standard is codified at § 46-5-401(1), MCA, and reads:

> In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.

7

"Whether particularized suspicion supports an investigative stop is a question of fact that is analyzed in the context of the totality of the circumstances." *Martinez*, ¶ 23 (citations omitted).

¶18    We agree with the District Court that a particularized suspicion supported Trooper Gleich's investigative stop of Clark's vehicle. Deputy Gleich received information that a domestic disturbance had been reported in Basin, Montana, involving two identified individuals. Deputy Gleich was informed that the two individuals had left Basin in a specific vehicle and in a specific direction. This information was initially provided to police by a known citizen informant, and was apparently accompanied by the sound of screaming, yelling, and breaking glass in the background of the call to police. From a previous and recent interaction with both identified individuals, Deputy Gleich knew that neither Clark nor Wing had a valid driver's license, yet one of them was apparently driving the vehicle. Deputy Gleich then informed Trooper Gleich of the vehicle's description, expected location, and license plate number.

¶19    As the District Court concluded, "the quantity of information and the quality of the information that was provided was both specific, and articulable, and provided particularized suspicion for experienced officers to draw rational inferences, resulting in suspicion of wrongdoing." Given that a domestic disturbance had been reported between Clark and Wing, Trooper Gleich was justified in stopping the green Ford Explorer in which Clark and Wing were traveling and separating the two individuals to investigate

8

the reported disturbance.  The fact that Trooper Gleich knew neither Clark nor Wing had a valid driver's license further justified stopping their vehicle.

*b. Miranda Warnings*

¶20    Clark argues he was not given *Miranda* warnings before he was placed in custody and consented to a search of his vehicle, and therefore all evidence seized in the search was illegally obtained in violation of his Fifth Amendment right to counsel and right against self-incrimination.  The State contends that Clark *was* given *Miranda* warnings before Deputy Gleich asked for his consent to search the vehicle, and regardless, *Miranda* is not implicated by a Fourth Amendment search and seizure.  The District Court agreed with the State, observing that "a request to search need not be preceded by *Miranda* warnings."  We agree.

¶21    The Fifth Amendment to the United States Constitution and Article II, Section 25 of the Montana Constitution protect a person against self-incrimination.  We explained this privilege against self-incrimination in *State v. Olson,* 2003 MT 61, 314 Mont. 402, 66 P.3d 297:

> [T]he prosecution may not use statements that stem from a custodial interrogation of a defendant unless the defendant is warned, prior to questioning, that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney.  [*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966).]  These "warnings" are often referred to as *Miranda* warnings.

9

*Olson,* ¶ 13; *accord State v. Reavley,* 2003 MT 298, ¶ 17, 318 Mont. 150, ¶ 17, 79 P.3d 270, ¶ 17; *State v. Wrzesinski,* 2006 MT 263, ¶ 29, 334 Mont. 157, ¶ 29, 145 P.3d 985, ¶ 29; *State v. Munson*, 2007 MT 222, ¶ 20, 339 Mont. 68, ¶ 20, 169 P.3d 364, ¶ 20.

¶22 In contrast, the Fourth and Fourteenth Amendments to the United States Constitution and Article II, Section 11 of the Montana Constitution protect against unreasonable searches and seizures. "[W]arrantless searches and seizures are per se unreasonable subject only to a few carefully drawn exceptions." *State v. Bieber*, 2007 MT 262, ¶ 29, 339 Mont. 309, ¶ 29, 170 P.3d 444, ¶ 29 (citations omitted). One such exception "arises when a citizen has knowledgeably and voluntarily consented to a search." *Bieber*, ¶ 29 (citation omitted). Although one factor in the totality of the circumstances of whether consent has been voluntarily given is whether the accused was advised of his or her *Miranda* rights, *Bieber*, ¶ 31, there is no requirement that *Miranda* warnings be given prior to a request for consent to search. *See e.g. U.S. v. Patane*, 542 U.S. 630, 644 n. 6, 124 S. Ct. 2620, 2630 n. 6 (2004) ("While Fourth Amendment protections extend to 'persons, houses, papers, and effects,' the Self-Incrimination Clause prohibits only compelling a defendant to be 'a witness against himself,' Amdt. 5.").

¶23 Because Clark does not argue that his consent was involuntary, Deputy Gleich's alleged failure to give Clark *Miranda* warnings does not invalidate Clark's consent to a search of his vehicle or the evidence seized therefrom. While *Miranda* warnings would have been necessary before any custodial interrogation of Clark, they were not necessary before Deputy Gleich asked to search Clark's vehicle. Consent to a search does not

constitute an incriminating statement, so Clark's Fifth Amendment rights were not violated by the search of Clark's vehicle.

### c. Scope of the Stop

¶24 Clark argues that once Deputy Gleich and Trooper Gleich ascertained that Wing was safe and unharmed, searching Clark's vehicle was unnecessary and exceeded the scope of the investigative stop. According to Clark, "[a]ll evidence seized in the ensuing search, which had nothing to do with checking on Robin Wing's welfare, must be suppressed."

¶25 We held in *Martinez* that an investigative stop is temporary and "may not last longer than is necessary to effectuate the purpose of the stop." *Martinez*, ¶ 27 (quoting § 46-5-403, MCA). However, while it is true that the officers' investigation of the domestic disturbance was complete after they determined Wing's well-being was not in jeopardy, that did not preclude the officers from thereafter requesting Clark's consent to search the vehicle. Indeed, by that time the scope of the stop had already been expanded, as Clark had been detained for driving with a suspended license and without proof of insurance. Once a stop has been made pursuant to a particularized suspicion, Montana law does not require additional justification for requesting consent. *State v. Snell*, 2004 MT 269, ¶ 17, 323 Mont. 157, ¶ 17, 99 P.3d 191, ¶ 17. Once Clark voluntarily consented to a search of his vehicle, the original purpose of the investigative stop was validly expanded once again. Even though searching Clark's vehicle was unrelated to Wing's

11

well-being, Clark authorized the search by giving his consent, and the District Court did not err in denying the motion to suppress the evidence discovered during the search.

### d. Adequacy of Consent

¶26    Clark argues that his consent to search the Ford Explorer was invalid because he was not the owner of the vehicle. To support his argument, Clark relies on our holding in *State v. Hill*, 2004 MT 184, 322 Mont. 165, 94 P.3d 752, wherein we held that an unauthorized driver of a rental car does not have a reasonable expectation of privacy in the contents of the car. *Hill*, ¶ 32. In that case, police contacted the rental agency for consent to search the car after the unauthorized driver exited the car and took his belongings with him. We held that "where the police, at the [vehicle] owner's request, take possession of a vehicle after allowing the unauthorized driver to retrieve his possessions from it, the vehicle's owner is the only party remaining to consent to a search of the contents." *Hill*, ¶ 35. From that statement, Clark extrapolates the rule that "the only party that is able to effectively grant a valid consent to search a car is the car's owner." Clark's argument is incorrect.

¶27    First, it cannot be deduced from *Hill* that the title-holder of a vehicle is the only party who will ever be authorized to consent to a search of that vehicle. The inquiry is dependent upon the totality of the circumstances, and the statements made in *Hill* reflected the facts of that case. Indeed, it is possible that, under certain circumstances, even the owner of property will not have authority to consent to a search. *See State v.*

12

*McLees*, 2000 MT 6, ¶ 17, 298 Mont. 15, ¶ 17, 994 P.2d 683, ¶ 17.  Thus, while property ownership is an important factor, it is not an exclusive factor.

¶28     Second, the facts of the present case indicate that Clark had possession and control of Hecker's Ford Explorer—including all of the items inside the vehicle—indefinitely, as a summer firefighter for Hecker.  Clark made personal use of the vehicle, keeping his personal effects in the vehicle and loaning the vehicle to other individuals without consulting Hecker.  Clark even went so far as to "trade" Hecker's vehicle with Piper for over a month so that the bank could not repossess Piper's vehicle.  Clark also used the vehicle to help Piper move from Basin to Butte.  In other words, Clark's use of the vehicle was not solely for purposes of his employment or in service to the vehicle's owner.  Rather, Clark chose where to drive the vehicle and controlled what was kept inside it.  Clearly, Clark had common authority to use and exert control over the Ford Explorer during the summer.  As such, he also had authority to consent to a search of the vehicle.  *See State v. DeWitt*, 2004 MT 317, ¶¶ 30-31, 324 Mont. 39, ¶¶ 30-31, 101 P.3d 277, ¶¶ 30-31.

### e.  Request for Counsel

¶29     Clark argues that his remark to Wing to "call the attorney now" as he was led to Trooper Gleich's patrol car amounted to an "unambiguous and unequivocal" request for a lawyer after which "all further questioning should have ceased."  The State responds that even if Clark was subject to a custodial interrogation, which he was not, Clark never told

13

*law enforcement* that he wanted an attorney present, and as such he never invoked his Fifth Amendment right to counsel.

¶30   Clark again seems to conflate and confuse his Fifth Amendment right to counsel and right against self-incrimination with his Fourth Amendment right against unreasonable searches and seizures.  As we noted earlier, law enforcement's request for consent to conduct a search is not a custodial interrogation protected by the Fifth Amendment, and the giving of consent to search is not an incriminating statement.  Moreover, while the invocation of the right to counsel "does not depend on the use of any particular words" and "must be construed broadly," *State v. Buck*, 2006 MT 81, ¶ 48, 331 Mont. 517, ¶ 48, 134 P.3d 53, ¶ 48, it is clear that in this case Clark never requested an attorney from law enforcement.  Clark's statement to Wing is distinguishable from that in *State v. Spang*, 2002 MT 120, ¶ 18, 310 Mont. 52, ¶ 18, 48 P.3d 727, ¶ 18, *overruled in part, Buck*, ¶ 48, in which we held that the defendant's statement to police, "Shit, I need a lawyer, man" was sufficient to invoke the right to counsel, and *State v. Johnson*, 221 Mont. 503, 719 P.2d 1248 (1986), in which we held the statement to police, "I would like to talk to somebody" also invoked the right to counsel.  *Spang*, ¶ 25; *Johnson*, 221 Mont. at 514, 719 P.2d at 1255.  At best, Clark simply asked Wing to call an attorney for him. The statement was not directed to Trooper Gleich and did not invoke Clark's right to counsel, regardless of whether the subsequent request for Clark's consent to search his vehicle constituted a custodial interrogation.  The District Court properly denied Clark's motion to suppress.

14

¶31    **2. Did the District Court abuse its discretion by excluding evidence of Clark's negative urinalysis results obtained six days after his arrest?**

¶32    Clark argues the jury should have been presented with evidence of a "clean" drug test Clark took six days after he was arrested. Clark argues that "[w]hile such evidence may not have completely exonerated Clark, it nevertheless was exculpatory, relevant, and within the scope of the jury's ability to consider and weigh all variables tending to make his guilt . . . more or less probable." According to Clark, he was entitled to a "reverse presumption" from our holding in *In re R.L.H.*, 2005 MT 177, ¶ 23, 327 Mont. 520, ¶ 23, 116 P.3d 791, ¶23, wherein we held that "the presence of an illegal substance in the body constitutes circumstantial evidence of prior possession of that substance." Apparently, Clark believes that the *absence* of an illegal substance in the body should constitute circumstantial evidence *against* prior possession of that substance. We disagree.

¶33    Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M. R. Evid. 401. "Evidence is relevant if it will have any value, as determined by logic and experience, in proving the proposition for which it is offered." *State v. Hamilton*, 2002 MT 263, ¶ 20, 312 Mont. 249, ¶ 20, 59 P.3d 387, ¶ 20 (citing *State v. Duffy,* 2000 MT 186, ¶ 43, 300 Mont. 381, ¶ 43, 6 P.3d 453, ¶ 43). Clark was charged with criminal possession of dangerous drugs based on the discovery of five pills found in his vehicle, not based on the use or ingestion of those or any other drug.

15

¶34    There is no logical connection between Clark's physical control over—and thus his possession of—dangerous drugs on August 9, 2004, and the absence of evidence six days later that he had actually ingested any drugs. *See Rodriguez v. Weber*, 617 N.W.2d 132, 140 (S.D. 2000) (concluding that "negative test result would not have created a reasonable doubt on knowledge of the presence of marijuana in the [vehicle].  One need not be a drug user to be a drug courier.").  Clark was not accused of using dangerous drugs, only of possessing them, so the absence of any evidence of use does not make his possession of such drugs any more or less probable.  Clark's negative urinalysis results were not relevant to the question of whether he was in possession of dangerous drugs on August 9, 2004.

¶35    **3.    Did sufficient evidence support the jury's verdict convicting Clark of criminal possession of dangerous drugs?**

¶36    Clark argues the State failed to provide sufficient evidence that he knowingly possessed dangerous drugs.  Clark relies on the fact that Piper had prescriptions for the three drugs found in his vehicle, and had recently been using the vehicle to move her belongings from Basin to Butte, to argue that the pills found in Clark's backseat belonged to Piper.  According to Clark, he did not know the pills were in his vehicle, and it was unreasonable to charge him with possession of those pills "without anything more than his presence in the vehicle Piper had used to move with."

¶37    The offense of criminal possession of dangerous drugs is defined in § 45-9-102, MCA (2003), and states: "A person commits the offense of criminal possession of dangerous drugs if the person possesses any dangerous drug, as defined in 50-32-101."

16

Possession is defined as "the knowing control of anything for a sufficient time to be able to terminate control." Section 45-2-101(58), MCA (2003). Possession can be either actual or constructive. *State v. Neely*, 261 Mont. 369, 374, 862 P.2d 1109, 1112 (1993). We have explained:

> Constructive possession occurs when the accused maintains control or a right to control the contraband; possession may be imputed when the contraband is found in a place which is immediately and exclusively accessible to the accused and subject to his dominion and control, or to the joint dominion and control of the accused and another person.

*Neely*, 261 Mont. at 374, 862 P.2d at 1112 (quoting *State v. Meader*, 184 Mont. 32, 43, 601 P.2d 386, 392 (1979)). "[I]n order to prove constructive possession, the State must prove (1) knowing (2) control of a (3) dangerous drug for sufficient time to be able to terminate control." *Neely*, 261 Mont. at 374, 862 P.2d at 1112 (citation omitted). For example, we held in *Neely* that the defendant was in constructive possession of dangerous drugs after drugs were found in her bedroom, she "was present when drugs were sold and used in her residence," and she "could have terminated control of the drugs at any time . . . by having them taken off the premises," but failed to do so. *Neely*, 261 Mont. at 374, 862 P.2d at 1112.

¶38 The jury was presented with evidence that Clark was driving the Ford Explorer when he was stopped by Trooper Gleich on August 9, 2004, and that the vehicle, for all intents and purposes, was his personal vehicle throughout the summer. Thus, the jury could conclude that the vehicle and everything inside it was subject to his immediate access, dominion, and control. Although Clark had lent the vehicle to Piper for over a

17

month, it was returned to him two days before he was stopped. Thus, a jury could conclude that Clark could have terminated his control over the pills—which were kept in small bindles, one of which had the phrase "Stay High" and a picture of a balloon—at any time after the vehicle was back in his possession, but that he failed to do so. *See Neely*, 261 Mont. at 374, 862 P.2d at 1112.

¶39 Upon viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that Clark possessed dangerous drugs. *Rennaker*, ¶ 16. Sufficient evidence supported the jury's verdict.

¶40 **4. Did the District Court abuse its discretion by admitting the testimony of a pharmacist, Tammy Cox, without conducting a *Daubert* hearing?**

¶41 Clark argues that the State's expert witness, Cox, should have been subjected to a *Daubert* hearing "to determine whether expert testimony was admissible on the novel issue of whether prescription medicine can be identified by visual reference only." According to Clark, the State should have completed a chemical analysis of the drugs found in Clark's backseat to identify the drugs. Instead, Cox simply identified the drugs as brand name OxyContin and generic Vicodin and Darvocet by comparing the unique imprint code on each pill, along with the color, make, and shape of the pills, with two national peer-reviewed computer databases. Clark argues that Cox's analysis of the drugs by visual reference only was "sub-par."

¶42 The admissibility of expert testimony is governed by M. R. Evid. 702: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert

by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." In *Barmeyer v. Mont. Power Co.*, we explained that "it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation." 202 Mont. 185, 193-94, 657 P.2d 594, 598 (1983) (*overruled on other grounds, Martel v. Mont. Power Co.*, 231 Mont. 96, 103, 752 P.2d 140, 145 (1988)) (quoting *U.S. v. Baller*, 519 F.2d 463, 466 (4th Cir. 1975)). We have adopted the various factors set forth by the United States Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94, 113 S. Ct. 2786, 2796-97 (1993), for assessing the reliability of proffered expert testimony, but we limit *Daubert*'s application to only *novel* scientific evidence. *State v. Damon*, 2005 MT 218, ¶ 18, 328 Mont. 276, ¶ 18, 119 P.3d 1194, ¶ 18. We assess novelty from a very narrow perspective. *Damon*, ¶ 18.

¶43 Cox's testimony regarding the identification of prescription drugs by reference to their unique imprint code and national pharmaceutical databases is not novel scientific evidence requiring a *Daubert* hearing. Aside from conclusory statements that Cox's testimony was "novel" and an admission elicited from Cox that the only way to be 100 percent certain of the drugs' content is to do a chemical analysis, Clark has presented no evidence that Cox's manner of identifying the pills was "novel" or unreliable. Cox testified at trial that she was confident in her determination that the pills found in Clark's vehicle were OxyContin and generic Vicodin and Darvocet. A *Daubert* hearing was not required.

19

¶44     Affirmed.


                                                /S/ JIM RICE


We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART