DA 10-0542

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2011 MT 246

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

HARLEY HOWARD,

      Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. ADC 09-182
Honorable Dorothy McCarter, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

      Joseph C. Engel, III.; Great Falls, Montana

    For Appellee:

      Steve Bullock, Montana Attorney General; C. Mark Fowler, Assistant
Attorney General; Helena, Montana

      Leo Gallagher, Lewis and Clark County Attorney; Carolyn Clemens,
Tara A. Harris, Deputy County Attorneys; Helena, Montana

               Submitted on Briefs:  July 20, 2011

                         Decided:  October 4, 2011

Filed:

_____
                  Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 On September 24, 2009, the State charged Harley Howard (Howard) with Incest (common scheme) for acts he allegedly committed against his daughter, D.H., from 2003 to 2005, when she was between six and eight years old. Following a jury trial in the First Judicial District Court, Lewis and Clark County, Howard was convicted of the charge on December 17, 2009. The District Court sentenced Howard to forty years in Montana State Prison with twenty years suspended. He appeals his conviction and his sentence. We consider the following issues on appeal:

¶2 *1. Whether Howard was denied effective assistance of counsel when his attorney did not challenge the competency of the State's two child witnesses or the admission of their hearsay statements.*

¶3 *2. Whether the District Court's imposition of sentence improperly considered Howard's claim of innocence.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 Howard and Rebecca Chapman married in 1995. In 1997, they had a daughter, D.H., and in 1998 a son, C.H. Between 1999 and 2004, Howard and Chapman separated and attempted reconciliation several times, but ultimately decided to divorce. The children stayed primarily with Howard in Helena, while Chapman moved to Butte to—according to her daughter—"look for a new family." In 2003, Chapman filed a motion with the Second Judicial District Court in Butte seeking to have the children reside primarily with her. In December 2003, the court issued a parenting plan to that effect

2

with Howard receiving parenting time approximately every other weekend. That arrangement continued for several years.

¶5 In 2006 Howard moved to Butte and remarried. The family's situation remained somewhat tumultuous, with Chapman appearing at Howard's residence while intoxicated and punching him, then later seeking alcohol treatment. In July 2007, an Amended Parenting Plan was entered, directing that the children remain primarily with Howard and allowing Chapman parenting time on alternating weekends.

¶6 In 2008, Chapman moved to Missoula. On June 15 of that year, D.H. and C.H. went to Missoula for Chapman's parenting time. Sarah Vandermuelen, Chapman's sister, was watching the children when D.H. disclosed to Vandermuelen that her father had molested her in the past. Vandermuelen told Chapman of the disclosure and Chapman reported the incident to Child and Family Services.

¶7 In response to the allegations, a video recorded interview of D.H. was conducted by pediatric nurse practitioner Mary Pat Hansen of First Step Resources Center. D.H. told Hansen the assaults began when she was about six years old and lasted until she was nearly nine years old. D.H. described specific instances in which Howard would take D.H. into his bedroom and perform sexual acts. Howard would make her take off her clothes and then rub his naked body and his "private part" on D.H. She explained white stuff would come out which Howard wiped away with a sock. D.H. related additional details of Howard's assaults, explaining that she hated performing these acts even though her father said, "you know you like it." D.H. stated one day she told Howard, "I'm too old for this," after which time he stopped the assaultive behavior.

3

¶8    Randi M. Hood and Jon Moog represented Howard at his four-day jury trial. D.H. testified for the State and tearfully recounted several instances of sexual assault by Howard. The State questioned D.H. about statements she made during the recorded interview with Hansen. She admitted some of what she told Hansen was not true, including what Howard's semen smelled like, that she kept a journal, and that she once saw Howard masturbate with her purple coat. D.H. explained she could not accurately describe the smell, she did not have a journal, and she had only seen Howard lying on his bed with her purple coat but nothing more. After recanting those previous statements, D.H. confirmed everything else she said had been the truth. D.H. stated she did not want to testify in court and she did not want to get her father in trouble because she loved him and missed him. At the end of the State's direct exam, D.H. offered the following testimony: "I'm not hiding anything, yet I want to. I was going to – but I didn't think it would be this hard, but what I was going to do is say nothing happened, but I can't say that."

¶9    On cross-examination, Hood questioned D.H. about various living arrangements between her parents and elicited an admission from D.H. that when Hansen interviewed her, "what I was thinking was my mom was trying to get custody of me again." D.H. also admitted she "exaggerated a lot" when she talked to Hansen. However, D.H. clarified, "I don't try to tell lies about my dad so my mom can get her way."

¶10    Hansen testified she interviewed D.H. on July 2, 2008. She stated, based on her training and experience, D.H.'s disclosure was consistent with a child who had experienced sexual abuse. Hansen based this determination, in part, on the fact that D.H.

4

could describe the events with great detail. On cross-examination, Hood informed Hansen D.H. had admitted to the jury she had lied about several things she told Hansen. When Hood asked if that admission would affect Hansen's assessment, she replied it would not. The State then offered the recorded interview into evidence. Hood objected, arguing the video gave "undue highlight to a portion of the evidence." The District Court overruled the objection and the video was shown to the jury.

¶11    D.H.'s eleven-year-old brother, C.H., also testified at trial. He stated he once was in the hallway of the apartment when he opened the door to his father's bedroom and saw Howard at the end of the bed, exposing his penis and buttocks in front of D.H. Both the State and Hood questioned C.H. more specifically about what he observed; however, he indicated it was difficult to recall exactly what occurred so long ago.

¶12    The State called several witnesses who provided their professional opinions as to the children's mental health. Rebecca Weston, a Child and Adolescent Psychotherapist, testified she began seeing D.H. for therapy in January, 2009. Weston said she gave D.H. a provisional diagnosis of Post Traumatic Stress Disorder (PTSD), which she described as an anxiety disorder experienced by people who have suffered very significant trauma. Weston stated, in her opinion, D.H.'s symptoms and physical manifestations were consistent with a child who had been sexually abused.

¶13    Dr. Melissa Neff, a Licensed Clinical Psychologist, testified she began seeing C.H. in October, 2008. Neff noted C.H. "was pretty articulate" and she was "impressed with how mature he was for a child his age." Based on her sessions with C.H. and the symptoms she observed, Neff diagnosed C.H. with PTSD. Neff based her assessment of

C.H. on his irritability, difficulty with concentration, and what she characterized as "intrusive thoughts" stemming from what he witnessed with his father and D.H.

¶14    Kathy Shea is a Licensed Clinical Social Worker who specializes in child sexual abuse cases. Shea testified it is common for children to recant their disclosures because they often do not appreciate the full ramifications of reporting abuse. Shea stated children may later deny they were victimized because they want things to go back to the way they were. On cross-examination, Shea acknowledged she had never met D.H. or C.H. and admitted none of her testimony was based on any of the specific facts of this case. Shea also conceded that false allegations, though rare, do occur, particularly in divorce-related situations.

¶15    At the conclusion of trial, the jury convicted Howard of Incest. On April 30, 2010, the court held a lengthy sentencing hearing and heard testimony from several witnesses. Ron Silvers, a sex offender evaluator and clinical therapist, performed an assessment on Howard. Silvers noted Howard's continued denial of the offense made it difficult to evaluate his attitudes, thought processes, and details of the offense. Silvers further explained Howard's rehabilitative potential necessarily involved consideration of Howard's own indication he did not perceive himself to be in need of therapy. Silvers opined that, while offenders who are "deniers" are not good candidates for outpatient treatment, they nevertheless are amenable to other rehabilitative responses. Silvers ultimately recommended Howard receive sex offender treatment and remain in a confined setting, such as house arrest or electronic monitoring, or "[a]t the very least a prerelease center."

6

¶16 Cathy Murphy, a Probation Officer for the State of Montana, conducted Howard's presentence investigation (PSI) and recommended Howard receive forty years in Montana State Prison with twenty years suspended. Murphy explained she based her ultimate recommendation on the need to treat Howard and to protect the children, given that Howard's youngest son was one year old. Murphy indicated Howard's continued denial did negatively impact the children, but she stated her recommendation was not influenced by Howard maintaining his innocence throughout the trial.

¶17 Howard offered a brief statement at the conclusion of the hearing. The District Court then sentenced Howard to forty years in the Montana State Prison with twenty suspended. The court ordered Howard not be parole eligible for ten years and until he completed Phase I of Sex Offender Treatment in prison.

## STANDARD OF REVIEW

¶18 Only record-based ineffective assistance of counsel claims are considered on direct appeal. *State v. Trull*, 2006 MT 119, ¶ 25, 332 Mont. 233, 136 P.3d 551. To the extent such claims are reviewable, they present mixed questions of law and fact that we review de novo. *State v. Green*, 2009 MT 114, ¶ 14, 350 Mont. 141, 205 P.3d 798. A sentence imposing incarceration for one year or longer is reviewed on direct appeal for legality only. *State v. Herd*, 2004 MT 85, ¶ 22, 320 Mont. 490, 87 P.3d 1017.

## DISCUSSION

¶19 ***1. Whether Howard was denied effective assistance of counsel.***

¶20 Howard asserts he was denied effective assistance because Hood (1) failed to challenge the competency of C.H. and D.H., (2) raised an improper objection to

7

admission of D.H.'s recorded interview, and (3) did not object to the admission of the children's hearsay statements based on their incompetency. This Court evaluates claims of ineffective assistance of counsel under the two-prong test articulated in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). To succeed under an ineffective assistance claim, the defendant must show (1) his attorney's performance was deficient, and (2) the deficient performance prejudiced his defense. *State v. Lindsey*, 2011 MT 46, ¶ 43, 359 Mont. 362, 249 P.3d 491. If an insufficient showing is made on one prong, we need not address the other. *Baca v. State*, 2008 MT 371, ¶ 16, 346 Mont. 474, 197 P.3d 948.

¶21 When claims of ineffective assistance are capable of resolution by examining the record alone, they are appropriate for consideration on direct appeal. *In re Hans*, 1998 MT 7, ¶ 41, 288 Mont. 168, 958 P.2d 1175. To make this determination, "we ask 'why' counsel did or did not perform as alleged and then seek to answer the question by reference to the record." *State v. Kougl*, 2004 MT 243, ¶ 14, 323 Mont. 6, 97 P.3d 1095. "If the record on appeal explains 'why,' we will address the issue on appeal." *Kougl*, ¶ 14. Howard contends, and we agree, that all of his arguments are appropriately raised and decided in this direct appeal of his conviction.

¶22 To demonstrate deficiency, a defendant must show his attorney's performance "fell below an objective standard of reasonableness measured under prevailing professional norms and in light of the surrounding circumstances." *Whitlow v. State*, 2008 MT 140, ¶ 20, 343 Mont. 90, 183 P.3d 861. In scrutinizing counsel's actions, we are highly deferential, indulging "a strong presumption that counsel's performance falls

8

within the wide range of reasonable professional assistance." *Kills On Top v. State*, 273 Mont. 32, 49, 901 P.2d 1368, 1379 (1995). To establish prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. The prejudice analysis considers "the likelihood of success of the actions counsel failed to take." *State v. Henderson*, 2004 MT 173, ¶ 9, 322 Mont. 69, 93 P.3d 1231. This Court need not address the two prongs in any particular order. *Whitlow*, ¶ 10. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

a. *Competency*

¶23 We evaluate and dispose of Howard's competency argument under the first *Strickland* prong. Howard asserts Hood's failure to challenge the competency of D.H. and C.H. amounted to ineffective assistance because the children were the primary witnesses for the State, they testified to events occurring several years ago, they were relating information from times marked by family turmoil, and both had been diagnosed with PTSD. Although these are notable concerns, and issues that Hood underscored throughout the trial, none forms the basis of a valid objection to the children's competency. Under the Montana Rules of Evidence, "every person is competent to be a witness" unless the court finds:

> (1) the witness is incapable of expression concerning the matter so as to be understood by the judge and jury either directly or through interpretation by

9

one who can understand the witness or (2) the witness is incapable of understanding the duty of a witness to tell the truth.

M. R. Evid. 601. A thorough review of the children's testimony reveals nothing to indicate a competency objection was warranted. D.H. identified her father and she capably described his sexual assaults. C.H. corroborated his sister's testimony by saying he once witnessed his father in Howard's bedroom exposing himself to D.H. Their responses to capacity questions showed they were intelligent, knew the difference between truth and falsity, and appreciated the moral duty to tell the truth.

¶24 Howard contends there were grounds for a competency challenge because D.H.'s testimony on the stand differed from her statements to Hansen. We do not agree. D.H. acknowledged the untruthful statements she had made to Hansen. Her identification of those lies, as she explicitly contrasted with the truth, demonstrated her appreciation for testifying accurately in court. The jury observed D.H.'s frank admissions on the stand. D.H. explained the discrepancies and was cross-examined by Howard's counsel on the statements she made. Even had D.H. not specifically identified those portions of her interview that were incorrect, the inconsistencies in her statements "go to witness credibility rather than competency[.]" *State v. Longfellow*, 2008 MT 343, ¶ 12, 346 Mont. 286, 194 P.3d 694. The jury was able to evaluate those statements and determine the weight D.H.'s testimony deserved.

¶25 Howard argues it is "axiomatic" that the competency of the complaining witness be ascertained in child sexual abuse cases. He contends Hood had "nothing to lose and everything to gain" by filing a competency motion. However, "there is no presumption

that a witness is incompetent and the burden is on the party asserting the incompetency to prove it." *State v. Stephens*, 198 Mont. 140, 143, 645 P.2d 387, 389 (1982) (citing *State v. Coleman*, 177 Mont. 1, 27, 579 P.2d 732, 748 (1978)).

¶26 This Court has upheld ineffective assistance of counsel claims where "there is no plausible justification" for counsel's conduct. *State v. Johnston*, 2010 MT 152, ¶ 16, 357 Mont. 46, 48, 237 P.3d 70; *Kougl*, ¶ 15; *State v. Jefferson*, 2003 MT 90, ¶ 50, 315 Mont. 146, 69 P.3d 641. We have not, however, found counsel ineffective for failing to raise a meritless claim. Counsel's failure to object does not constitute ineffective assistance when the objection lacks merit and properly would have been overruled. *State v. Heddings*, 2011 MT 228, ¶ 33, ___ Mont. ___, ___ P.3d ___; *Dawson v. State*, 2000 MT 219, ¶ 108, 301 Mont. 135, 10 P.3d 49; *Kills On Top*, 273 Mont. at 51, 901 P.2d at 1380; *State v. Rogers*, 257 Mont. 413, 421, 849 P.2d 1028, 1033 (1993).

¶27 Here, the record is devoid of any indication D.H. and C.H. could have been subjected to a competency attack. Howard notes both children had been diagnosed with PTSD, but he fails to discuss how this affected their ability to express themselves or to testify truthfully. Likewise, none of the additional testimony, including that of the children's therapists, remotely implied the PTSD inhibited the children's ability to accurately relate their experiences to a jury. Reports of mental disorders alone "are not sufficient to require a conclusion that the witness was incompetent, incapable of expressing himself concerning the matter, or incapable of understanding the duty to tell the truth." *State v. Arlington,* 265 Mont. 127, 159-60, 875 P.2d 307, 326 (1994).

11

Howard has demonstrated no connection between the PTSD diagnosis and competency, and none is evident from the record.

¶28   Moreover, Hood had ample opportunity prior to trial to ascertain whether D.H. and C.H. were indeed competent to testify. Hood's cross-examination of D.H. regarding her statements to Hansen indicates she had carefully reviewed D.H.'s recorded interview before trial. Further, Hood employed an investigator during discovery to interview and record both children's statements concerning what they observed and experienced. This information was sufficient for Hood to determine a competency objection was unlikely to succeed. We conclude Howard has not met his burden to show deficient performance by counsel's failure to contest the children's competency to testify.

        b.     *Recorded Interview between D.H. and Hansen.*

¶29   Hood objected to the admission of Hansen's July 2008 recorded interview with D.H. on grounds the DVD gave undue highlight to a portion of the evidence. The State argued the DVD included D.H.'s prior inconsistent statements and was admissible pursuant to *State v. Lawrence*, 285 Mont. 140, 948 P.2d 186 (1997). The District Court overruled Hood's objection and admitted the DVD.

¶30   Howard asserts Hood's response to the proffer of the DVD was deficient because she did not raise the correct objection and because she did not challenge the DVD on the basis of the Confrontation Clause. We find both arguments unavailing. Howard first contends Hood should have objected on the basis that the DVD did not qualify as a hearsay exception under either M. R. Evid. 801(d)(1)(A), as a prior inconsistent

12

statement, or M. R. Evid. 801(d)(1)(B), as a prior consistent statement offered to rebut a charge of improper influence.

¶31 Howard first argues Rule 801(d)(1)(A) would have precluded the admission of the DVD because D.H. did not testify to a lack of memory concerning her earlier statements. Notwithstanding the fact that D.H. did testify several times to a lapse in memory, Howard's contention misapprehends our holding in *Lawrence*. There, we held it was not an abuse of discretion for the District Court to admit consistent statements along with inconsistent ones where the nature of the witness's testimony made it difficult for the court to separate the consistent from the inconsistent portions of the prior statement. *Lawrence*, 285 Mont. at 160, 948 P.2d at 198. In that case, we also stated a claimed lapse of memory constitutes an inconsistent statement for the purposes of M. R. Evid. 801(d)(1)(A). *Lawrence*, 285 Mont. at 159, 948 P.2d at 198. We did not, however, hold claimed memory lapse was the only ground for application of Rule 801(d)(1)(A).

¶32 Here, at least in part, D.H. testified inconsistently with what she told Hansen. She admitted on the stand that several things she said during the interview were in fact not true. While the DVD also included D.H.'s prior consistent statements encompassed by Rule 801(d)(1)(B), the State anticipated this hearsay concern by citing *Lawrence* in its response to the objection. The court overruled the objection and, on the authority of *Lawrence*, we cannot conclude an objection on hearsay grounds would have had merit. Based on the record, we find nothing deficient about Hood's failure to raise a specific hearsay objection. She objected to the DVD on a proper basis, arguing it was unduly prejudicial under M. R. Evid. 403 because it highlighted testimony which was already in

13

evidence. The court, in its discretion, overruled the objection and Howard has not challenged that ruling on appeal.

¶33   Howard contends Hood should have raised an objection under the Confrontation Clause and was ineffective by failing to do so. In *Crawford v. Wash.*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004), the Supreme Court held testimonial hearsay statements of witnesses absent from trial are inadmissible under the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. Howard claims D.H. was "unavailable" for cross-examination regarding the DVD because it was introduced a day after D.H. testified. We reject this argument. As *Crawford* makes clear, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." 541 U.S. at 59 n. 9, 124 S. Ct. at 1369, n. 9. The record reveals Hood cross-examined D.H. extensively on the statements she made to Hansen. While questioning D.H., Hood highlighted the girl's admitted lies during Hansen's interview. Hood also elicited testimony from D.H. that she "exaggerated a lot" in the interview and she "thought that if [she] said that kind of stuff it would be the kind of things [her] mom would want [her] to say."

¶34   Under the particular circumstances, we find no merit in Howard's claim that it was ineffective assistance for Hood to fail to raise a Confrontation Clause objection. Such a challenge had no chance of success as Hood tacitly acknowledged when she stated, "[t]he witness was present to be cross-examined." Hood's recognition and distinction of valid

14

claims from those unlikely to succeed demonstrates her assistance at trial was far from deficient.

      c.     *D.H. and C.H.'s Hearsay.*

¶35    Howard argues his substantial rights were prejudiced by Hood's failure to object to hearsay statements from the children's therapists. Howard's contention relies on three dependent premises: (1) the children were incompetent to testify and thus unavailable; (2) D.H.'s prior inconsistent statements were admissible, but could not support a conviction alone pursuant to *State v. White Water*, 194 Mont. 85, 89, 634 P.2d 636, 639 (1981); and (3) C.H.'s hearsay statements were insufficient to corroborate D.H.'s prior inconsistent statements.

¶36    As explained above, we already have rejected Howard's first contention that the children were incompetent to testify. Howard's reliance on legal authority concerning unavailable witnesses is inapposite to this case. Howard's second assertion assumes D.H.'s inconsistent statements were the sole grounds for Howard's conviction. This was not the case. There was ample testimony from D.H. describing her father's repeated sexual assaults and she maintained on the stand she was telling the truth in regard to those statements. While D.H. admitted she lied about details of some alleged incidents, those details did not render the weight of her testimony inconsistent such that corroboration was required to support Howard's conviction. Accordingly, Howard's reliance on *White Water* is misplaced. As to Howard's third contention, C.H. testified and was cross-examined. C.H.'s trial testimony corroborated D.H.'s testimony, with or without the hearsay statements from C.H.'s therapist.

15

¶37   Montana law allows a therapist to testify to a child's credibility in sexual abuse cases when the victim testifies, the credibility of the child is attacked, and the expert is properly qualified. *State v. Riggs*, 2005 MT 124, ¶¶ 21-22, 327 Mont. 196, 113 P.3d 281 (citing *State v. Harris*, 247 Mont. 405, 410-11, 808 P.2d 453, 455-56 (1991); *State v. Geyman*, 224 Mont. 194, 200, 729 P.2d 475, 479 (1986)).   Here, both D.H. and C.H. testified.   Hood questioned the children's credibility based on their inconsistent statements and their complex family environment, inferring the parents' custody battles may have influenced the children's testimony.  The State's experts then testified D.H. and C.H.'s statements were consistent with children who had suffered sexual abuse.  Hood was quick to underscore it was not their job to determine whether the children were telling the truth, only to provide treatment.

¶38   Howard's contention Hood should have objected to the children's hearsay statements overlooks Hood's trial strategy to use that very testimony to question the children's reliability and veracity in an attempt to create reasonable doubt.   Hood emphasized the false statements D.H. made to other witnesses to argue D.H. should not be believed.  Hood also used D.H.'s hearsay to attack Hansen's credibility.  Hood noted Hansen based her determinations on D.H.'s attention to detail, yet Hansen said her impressions would not change even though D.H. admitted she was lying about several specific things she told Hansen.  Hood argued in closing that, "[t]here apparently is no point at which they don't find a way to explain the change in story."

¶39   We find no merit in Howard's claim of ineffective assistance.  His hearsay theory is unsupported by appropriate legal authority and does not accurately reflect the record.

16

Even if Howard's hearsay objection had a possibility of succeeding, Howard cannot demonstrate he was prejudiced by Hood's failure to raise it. Hood effectively utilized the children's hearsay statements to attack the veracity and credibility of the State's primary witnesses. Hood did not provide ineffective assistance under either prong of the *Strickland* test in failing to object to the hearsay statements.

¶40 Howard asks this Court to apply the doctrine of cumulative error because the State's case consisted entirely of the incompetent testimony of the children, the recorded DVD and the statements of the therapists. The doctrine is appropriate to reverse a defendant's conviction only "where a number of errors, taken together, prejudiced the defendant's right to a fair trial." *State v. Ferguson*, 2005 MT 343, ¶ 126, 330 Mont. 103, 126 P.3d 463. The defendant has the burden of establishing prejudice and "mere allegations of error without proof of prejudice are inadequate to satisfy the doctrine." *Ferguson*, ¶ 126. As discussed above, we find no errors in Hood's defense of the case; therefore, we decline to apply the doctrine here.

¶41 ***2. Whether the District Court's imposition of sentence improperly considered Howard's claim of innocence.***

¶42 Howard asserts the District Court's sentence violated his Fifth Amendment right against self-incrimination because during his sentencing hearing two witnesses for the State noted Howard continued to deny molesting D.H. The State responds the sentencing hearing, taken as a whole, focused on Howard's amenability to treatment and the sentence imposed was not based on his continued claim of innocence.

¶43 A district court may not augment a defendant's sentence because he refuses to confess to a crime. *State v. Rennaker*, 2007 MT 10, ¶ 44, 335 Mont. 274, 150 P.3d 960. Nor may a trial court punish a defendant for failing to accept responsibility for the crime when he has expressly maintained his innocence at trial and has a right to appeal the conviction. *State v. Morris*, 2010 MT 259, ¶ 22, 358 Mont. 307, 245 P.3d 512.

¶44 Upon conviction, Howard was subject to a maximum term of 100 years in prison and a fine up to $50,000. Section 45-5-507(4), MCA. Howard does not contest that his forty-year sentence is within the statutory maximum for the charge of which he was convicted.

¶45 In considering the issue raised by Howard, we first examine whether the defendant invoked his right to remain silent or maintained his innocence. *State v. Garcia*, 2011 MT 130, ¶ 11, 360 Mont. 537, 254 P.3d 589; *Rennaker*, ¶ 44. We have stated it is incumbent upon a person seeking the protection of the Fifth Amendment to affirmatively invoke his right to remain silent. *State v. Fuller*, 276 Mont. 155, 160, 915 P.2d 809, 812 (1996). Here, Howard did not take the stand at trial, but he did testify during the sentencing hearing. Howard did not affirmatively maintain his innocence at that time and in fact stated, "I definitely would say I do need therapy." Howard also pleaded with the court to send him to jail if the alternative was that his current wife would lose custody of their children. Based on the record, we find Howard did not expressly invoke his right to remain silent or maintain a claim of innocence at sentencing.

¶46 We next consider the evidence used by the District Court to determine Howard's sentence. *Garcia*, ¶ 11. The trial court is permitted to "consider any evidence relevant to

18

a defendant's sentence, including evidence relating to the crime, the defendant's character, background history, mental and physical condition, and any other evidence the court considers of probative force." *Rennaker*, ¶ 49. Although a court may not punish a defendant for refusal to admit guilt, it may consider a defendant's lack of remorse. *State v. Shreves*, 2002 MT 333, ¶¶ 7, 20, 313 Mont. 252, 60 P.3d 991. The pertinent sentencing policy of the state of Montana is to:

> (a) punish each offender commensurate with the nature and degree of harm caused by the offense and to hold an offender accountable; [and]

> (b) protect the public, reduce crime, and increase the public sense of safety by incarcerating violent offenders and serious repeat offenders[.]

Section 46-18-101(2)(a)-(b), MCA.

¶47 In this case, the trial court heard extensive testimony from six witnesses during the sentencing hearing. As noted, the State called Ron Silvers, a clinical member of the Montana Sex Offender Treatment Association (MSOTA), and Cathy Murphy, a probation officer. Howard's witnesses included Christopher Quigley, a member of the MSOTA who also performed a sex offender evaluation on Howard; Nicole Stuart, Howard's sister; Floy Collins, a character witness for Howard; and Marla North, a member of MSOTA who performed an additional evaluation on Howard. The majority of the hearing centered on assessing Howard's risk and his treatment amenability.

¶48 In support of his argument, Howard isolates testimony from the State's witnesses noting the effect Howard's denial has on his treatment and his family. Howard quotes Silvers, who stated Howard was "not able to take responsibility for the offense for which he has been convicted" and "present[ed] a significant risk for re-offense." Silvers also

19

stated: "Those individuals who have not taken responsibility for their offense . . . have not earned an outpatient slot." Howard further notes the following statement from Murphy after the State asked how Howard's denial impacted D.H. and C.H.:

> Mr. Howard had the opportunity to plead guilty to this offense and he chose not to . . . . In doing that, he sacrificed his own children. . . . They had to hear their father say that they were liars and it didn't happen, and it . . . must make them feel like they don't count and that there is no justice in the world.

¶49 Howard's sole argument is that, because the court ultimately sentenced Howard within the parameters of Murphy's recommendation, the court must have been punishing Howard for his denial of guilt. We cannot agree. First, Silvers never insinuated that Howard be punished for maintaining his innocence but he did discuss how Howard's denial would pose significant barriers to effective treatment. Further, Murphy affirmed on direct and cross-examination that Howard "absolutely" had a right to deny the crime and maintain his innocence. Murphy also specifically rejected the notion her recommendation was influenced by Howard taking his case to trial. Instead, Murphy based her recommendation on her review of Howard's psychosexual evaluations, his rehabilitative potential, and the risks posed to the children due to his denial of his conduct.

¶50 Finally, we consider whether there is any conflict between the written judgment and the oral pronouncement. Here, there is no significant difference; however, the oral sentence included the court's reasoning for imposing the sentence, thus, it controls here. *Garcia*, ¶ 11. The court's oral pronouncement of the reasons for the sentence belies the notion Howard's sentence was influenced by his proclamations of innocence:

The reasons for this sentence are number one, the gravity of the offense. Number two, for the protection of the children of the family until the youngest one is grown. Number three, I believe that the Defendant poses a danger to the community as an untreated sex offender. And number four, I believe the sentence needs to send a message to the victim that – to actually both of those children that the little girl was wronged and that there is justice for what's been done and that . . . she is safe.

Given the extensive information presented and the reasons articulated by the court, the record does not reflect that Howard's sentence was based upon his refusal to take responsibility and admit his crime. *See State v. J.C.*, 2004 MT 75, ¶¶ 39-41, 320 Mont. 411, 87 P.3d 501. We cannot say the District Court's sentence was augmented because Howard maintained his innocence. The District Court's sentence was within the statutory parameters for incest and based on ample testimony relating to Howard's treatment potential, risk to his children, and numerous psychosexual evaluations.

¶51     The judgment of the District Court is affirmed.


                                        /S/ BETH BAKER


We concur:

/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS