DA 22-0083

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2024 MT 255

STATE OF MONTANA,

      Plaintiff and Appellee,

   v.

WES LEE WHITAKER,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
                    In and For the County of Missoula, Cause No. DC-2018-468
                    Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Tammy Hinderman, Appellate Defender, Michael Marchesini, Assistant
          Appellant Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Tammy K Plubell, Assistant
          Attorney General, Helena, Montana

          Matthew C. Jennings, Missoula County Attorney, Brian Lowney, Deputy
          County Attorney, Missoula, Montana

                        Submitted on Briefs:  April 24, 2024

                                  Decided:  November 6, 2024

Filed:

                        _____
                                     Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Wes Lee Whitaker (Whitaker) was convicted after a jury trial of sexual intercourse without consent (SIWC), incest, and sexual assault. He appeals, arguing that trial errors require reversal of his convictions, and that his convictions for SIWC and sexual assault violate double jeopardy and the multiple conviction statute.

¶2 We address the following restated issues:

1. *Did the District Court violate Whitaker's confrontation right by allowing a prisoner to testify against Whitaker via video from a federal prison in Illinois?*

2. *Did the District Court abuse its discretion by admitting the victim's forensic interview and other statements into evidence?*

3. *Do Whitaker's convictions of both SIWC and sexual assault violate double jeopardy as they are based upon the same act?*

We affirm on Issues 1 and 2, and reverse the sexual assault conviction under Issue 3, which the State also concedes.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 L.M. was born in September 2014. Shortly after her first birthday, L.M.'s mother, Jessica, began dating Whitaker. They lived together in Billings and married in July 2017. Whitaker and Jessica had a daughter together, A.W. Over time, Jessica and Whitaker struggled in their marriage, and they sought marriage counseling while in Billings. Whitaker received a job promotion that led to the family moving to Missoula in April 2018, and they discontinued counseling sessions. In June 2018, Whitaker hit Jessica in the mouth during a fight, whereafter Jessica took L.M. and A.W. to Glasgow to stay with Jessica's

2

mother for a while. Jessica returned to Missoula with the children because she loved Whitaker and wanted their marriage to work for the benefit of the children.

¶4 Jessica first became concerned about potential abuse by Whitaker one evening when she fell asleep in the living room next to L.M. She awoke and realized L.M. was gone, and then saw L.M. coming out of Whitaker's room, fastening her pajama bottom. Another time, when Jessica was explaining to L.M. that grown-ups should not be "touching [L.M.'s] privates," L.M. responded by asking: "even your daddy?" Shocked by L.M.'s response, Jessica did not pursue the issue further at that time.

¶5 Another evening in July 2018, Jessica again awoke after falling asleep in the living room, and heard noises coming from her bedroom. She went into the bedroom and saw Whitaker lying on his side, wearing only boxer shorts and facing away from her, while L.M. was standing in front of him naked. As Jessica entered the room, Whitaker was pulling up L.M.'s underwear. Jessica confronted Whitaker, who was surprised to see her and rushed into the bathroom, shutting the door. She noticed Whitaker had an erection. Jessica began questioning L.M., and when Whitaker came out of the bathroom, Jessica asked him to leave, but he refused. Whitaker told Jessica that L.M. had been asleep on the bed, but had fallen onto the floor, which caused the sound that awoke Jessica.

¶6 After this experience, Jessica became suspicious of Whitaker and would not allow L.M. to be with him alone. Wanting to keep her marriage and family intact, Jessica did not call police. Later, on July 7, 2018, while Jessica was giving L.M. a bath, L.M. spontaneously interjected that Whitaker had "touched her diamond." Jessica was

3

unfamiliar with that term, so she asked L.M. what her "diamond" was, and L.M. responded by "point[ing] down to her private parts and said her pee-pee." Jessica texted her friend, Brittany, saying that something bad had happened and asking if she and the children could stay the night at Brittany's home. Brittany agreed, but also, unbeknownst to Jessica, contacted police. The Missoula police arrived at Brittany's home and Officer Ken Smith observed that Jessica was distraught and crying. Unprompted, L.M. told Officer Smith that Whitaker had touched her "right here" while pointing downwards to her genitals. A Sexual Assault Nurse Examiner, Adeline Wakeman (Wakeman), examined L.M. that night. Wakeman observed redness around L.M.'s vagina, but could not determine that it was caused by sexual contact. L.M. told Wakeman that her "diamond" hurt because "[d]addy pushes in and out really fast like this," while demonstrating by thrusting her pelvis back and forth.

¶7 On July 9, 2018, forensic interviewer Cat Otway (Otway) conducted an interview with L.M. In the interview, L.M. told Otway that her dad had given her "owies" in her groin and buttocks areas. L.M. reported that this had occurred in the living room and happened between two and four times. L.M. again made a thrusting motion with her hips to describe what Whitaker had done. She also said he used his "diamond," which had hair on it, to touch her buttocks, and described how his "diamond" had rubbed against hers.

¶8 Whitaker was arrested and charged with SIWC, incest, and sexual assault. In telephone calls Whitaker made from the jail to Jessica, she told him she was terminating the relationship. Whitaker was upset, and said he did not want his daughter, A.W., to know

4

him "for this," so he would plead guilty to spare the family the burden of a trial. However, when interviewed by Detective Crocker about the bedroom incident when Jessica had walked in, Whitaker said he went to bed drunk that night and had locked his bedroom door, but when he awoke, his door was open, his clothes were off, and L.M. was inside his bed naked. He said this was why he was putting her clothes back on. When asked directly whether he had abused L.M., he told Detective Crocker that he "could not remember" ever abusing her, and that it was possible that "Jessica had planted these ideas in L.M.'s mind."

¶9 Trial did not begin until almost three years later, in June 2021. L.M. was then six years old. In her testimony, L.M. was able to recall that Whitaker touched her private parts, which she identified, and said that Whitaker used his private parts to touch hers. L.M. did not remember her forensic exam with Wakeman or her interview with Otway, nor many of the details she had reported in those sessions about the purported abuse. Based on L.M.'s inability to recall, the State sought to admit L.M.'s statements made to Wakeman and Otway as prior inconsistent statements, arguing L.M.'s lack of recall about these conversations generated the inconsistency. The District Court admitted the statements over Whitaker's hearsay objection. Wakeman read her notes from her examination of L.M., stating that L.M. called her genital area her "diamond," and that "Daddy told me not to talk to mom and not to go to the doctor." Wakeman also testified that, when she asked L.M. when her private parts began to hurt, L.M. responded, "When Daddy touched my diamond." Wakeman confirmed that these were direct quotes from L.M.

5

¶10    Otway testified that she was certified and had conducted over a thousand forensic interviews with children. Over Whitaker's hearsay objection, the State was permitted to play a portion of the forensic interview video, about 25 minutes in length. In the video, L.M. described the sexual abuse similarly as before, including that Whitaker told her not to tell her mother, and that Whitaker had touched the "outside" area of her private parts and "opened it." She reiterated that Whitaker's "diamond" touched her back side and gave her "owies." The video was paused several times for Otway to explain the techniques she was employing to secure accurate responses from L.M.

¶11    The State called Jamie Grubb (Grubb) to testify, who was then a prisoner at a federal detention center in Illinois, but had earlier been incarcerated with Whitaker at the Missoula County Detention Facility. The State sought leave for Grubb to testify via two-way video, to which Whitaker objected as a violation of his right of confrontation. The District Court overruled the objection and permitted Grubb to testify by video. Initially, the State's motion, filed in February 2020, was based upon Grubb's incarceration in Illinois and the impracticality of physical travel to Missoula. When the State advised the District Court that the federal prison required a written order to make Grubb available by video, the court issued a brief written order in May 2020, about a year before the trial. However, the District Court also explained it would grant the motion because of the COVID-19 pandemic, which had then just begun. Later, in an October 7, 2020 pre-trial hearing, the District Court again explained that, "[i]t's theoretically possible to bring [out-of-state witnesses] to Montana, but given all the COVID restrictions and everything else, I'm finding it more appropriate

to have them testify [remotely]." Then, in January 2021, the District Court again referenced continuing concerns over COVID-19, and concerns about a federal inmate traveling to testify. Shortly prior to the start of trial, the District Court received authorization to relax some COVID-19 precautions, such as mask requirements in the courtroom, but the updated protocols continued to encourage remote appearances for those considered to be high-risk to COVID. Grubb testified about the conversations he had with Whitaker when they were cell mates, including that Whitaker acknowledged getting into bed with L.M. and "ended up rubbing [himself] up against her" before "[Jessica] came home, and almost caught [them]." Grubb recalled Whitaker relating he told L.M. to refer to her vagina as her "diamond," so that no one would catch on to what he was doing. Most of Grubb's video testimony was without technical issue, although there were instances where he asked for clarification due to disruptions and "cutting out" in the video. Detective Crocker testified that Grubb contacted her and relied Whitaker's use of the term "diamond," which Crocker found "investigatively significant" because that information "wasn't public."

¶12 Whitaker contended at trial that L.M.'s testimony was based on coaching and otherwise "tainted." He called an expert witness, Dr. Donna Zook, a clinical psychologist, to challenge the forensic interview and examination of L.M. She testified that, on several occasions during the interview, Otway had suggested answers to L.M. and reinforced some answers offered by L.M. She also testified it was common for young children to fuse disparate memories together and believe that the resulting, fabricated memories were real.

7

¶13 In closing argument, the State focused on the July 2018 incident involving Whitaker handling L.M.'s underwear while he was laying on the bed and had an erection. The prosecution argued that "on those facts alone . . . that is sufficient on its own to convict him of these three offenses," given the testimony also offered by L.M.

¶14 The jury found Whitaker guilty of the three charges. At sentencing, the District Court determined that Whitaker was not amenable to rehabilitation due to a serious criminal history, which included prior sexual offenses. The prosecutor recommended that sentences run concurrently. The District Court thereafter imposed three 100-year sentences to run concurrently, and designated Whitaker a third-tier sex offender.

¶15 Whitaker appeals.

**STANDARD OF REVIEW**

¶16 "This Court exercises plenary review of constitutional questions and applies de novo review to a district court's constitutional interpretation of the Sixth Amendment of the United States Constitution and Article II, Section 24 of the Montana Constitution." *State v. Walsh*, 2023 MT 33, ¶ 7, 411 Mont. 244, 525 P.3d 343. We also apply de novo review to a double jeopardy violation claim, which presents a question of law. *State v. Duncan*, 2012 MT 241, ¶ 5, 366 Mont. 443, 291 P.3d 106.

¶17 "We review evidentiary rulings for an abuse of discretion." *State v. Smith*, 2021 MT 148, ¶ 14, 404 Mont. 245, 488 P.3d 531. "A district court abuses its discretion if it acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of

reason resulting in substantial injustice." *State v. Palmer*, 2024 MT 25, ¶ 10, 415 Mont. 150, 543 P.3d 566.

## DISCUSSION

¶18     *1. Did the District Court violate Whitaker's confrontation right by allowing a prisoner to testify against Whitaker via video from a federal prison in Illinois?*

¶19     Whitaker argues his right to confront a witness against him was violated when the District Court permitted Grubb to testify via video. He argues the prosecutor's original basis for the motion—that securing Grubb's testimony would be impractical—was an insufficient ground to justify the request, and the State could readily have sought Grubb's transport to Missoula pursuant to "a state writ of habeas corpus ad prosequendum or ad testificandum" authorized by 28 C.F.R. § 527.30. Whitaker contends the lack of physical, face-to-face contact with Grubb during trial potentially diminished the accuracy of the jury's factfinding and therefore undermined the fairness of his trial. The State answers that the prosecution's original request in February 2020 was premised upon its reading of *City of Missoula v. Duane*, 2015 MT 232, 380 Mont. 290, 355 P.3d 729, which permitted an out-of-state witness to testify via video, citing the "significant burden" it would place on him and the City for him to testify in person for three separate but related Montana misdemeanor trials. The State notes that our decision in *State v. Mercier*, 2021 MT 12, 403 Mont. 34, 479 P.3d 967, was issued after the prosecution's motion was filed, and that thereafter the discussion before the District Court focused on the problems posed by the pandemic, which remained a serious issue at the time of trial.

9

¶20     We have discussed the application of the constitutional confrontation provisions, U.S. Const. amend. VI and Mont. Const. art. II, § 24, at length in recent decisions. *See Mercier*, ¶¶ 14-28; *State v. Bailey*, 2021 MT 157, ¶¶ 40-49, 404 Mont. 384, 489 P.3d 889; *State v. Martell*, 2021 MT 318, ¶¶ 10-15, 406 Mont. 488, 500 P.3d 1233; *State v. Walsh*, 2023 MT 33, ¶¶ 8-11, 411 Mont. 244, 525 P.3d 343; *State v. Corena Marie Mountain Chief*, 2023 MT 147, ¶¶ 26-30, 413 Mont. 131, 533 P.3d 663; and *State v. Strommen*, 2024 MT 87, ¶¶ 16-30, 416 Mont. 275, 547 P.3d 1227. The U.S. Supreme Court has explained the right is not absolute, and can be satisfied in circumstances "where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Maryland v. Craig*, 497 U.S. 836, 850, 110 S. Ct. 3157, 3166 (1990); *see Mercier*, ¶ 17 (quoting *Craig*, 497 U.S. at 850, 110 S. Ct. at 3166) ("[I]t is all but universally assumed that there are circumstances that excuse compliance with the right of confrontation.").

¶21     We have applied *Craig*'s two-prong analysis to determine whether an exception to the right of face-to-face confrontation has been established. *Strommen*, ¶ 19; *Mercier*, ¶ 18; *Walsh*, ¶ 10. Generally, under the first prong, the party seeking admission of the testimony must show that "denial of physical face-to-face confrontation is necessary to further an important public policy." *Mercier*, ¶ 18. Under the second, the district court must "determine that reliability of the testimony is otherwise assured." *Mercier*, ¶ 18.

¶22     This Court has explained that "judicial economy, added expense, or inconvenience alone are not important public policies sufficient to preclude the constitutional right of a

10

defendant to face-to-face confrontation at trial," *Martell*, ¶ 12, although they may be a part of the consideration of the circumstances. *See Duane*, ¶ 21 (noting "a prohibitive expense on the City and a significant burden" on the out-of-state witness to testify in three separate trials). Additionally, evidence supporting an important public policy must be "case-specific," and not based on merely generalized findings. *Walsh*, ¶ 10.

¶23 Whitaker's trial occurred during the COVID-19 pandemic. Whitaker argues this was not the original basis for the State's February 2020 request for Grubb to testify by video, but it quickly became so, subsumed within the logistical challenges that arose in conducting trials during the pandemic. In several pre-trial meetings, including in May 2020, October 2020, and January 2021, the District Court discussed the proposed video testimony in light of the COVID-19 pandemic. Each time, the District Court reaffirmed the propriety of using video testimony under then-current health precautions, which, as we have previously explained, had been ordered by this Court. *See Strommen*, ¶ 7. Whitaker argues that the pandemic had significantly subsided by the time of the trial in June 2021, and, to be sure, this Court revised COVID-19 guidelines several times over this period to adapt to changing guidance from public health authorities. While there was a summertime reduction in active COVID-19 cases in 2021, the disease continued to present a serious public health concern during that time, including the then-recent advent of the Delta Variant, which public health authorities warned was deadlier and more contagious than other variants of COVID-19. As Whitaker's briefing itself notes, "[t]he

11

District Court did not have a crystal ball." The pandemic clearly became the central pre-trial concern in allowing Grubb to testify remotely.

¶24 Further, as a long-term inmate, first in a local facility and then at a federal prison, Grubb was at a higher risk to become infected by the COVID-19 virus and transfer it to others, heightening the concerns that justified video testimony for a foreign witness during the pandemic in *Walsh*. *Walsh*, ¶ 11. As the Chief Justice wrote in a March 2020 letter, "the confines of [correctional] facilities, [make it] virtually impossible to contain the spread of the virus." McGrath, C.J., *Letter to Montana Courts of Limited Jurisdiction Judges* (March 20, 2020), https://perma.cc/MH6X-JMQS. Studies on the topic have confirmed that COVID-19 infection rates are higher among prisoners compared to the general population. *See* Esposito M., et al., *The Risk of COVID-19 Infection in Prisons and Prevention Strategies: A Systematic Review and a New Strategic Protocol of Prevention*, Nat'l Libr. of Med. (Jan. 29, 2022), https://perma.cc/4KJY-L63C. The District Court expressed concern on several occasions about Grubb travelling from out-of-state, and the District Court specifically explained in the October 2020 pre-trial hearing that it would be more appropriate for him to testify through video. Whitaker argues these sessions did not constitute the requisite "case-specific finding of necessity" under *Craig* and this Court's holdings. However, while the District Court did not enter written findings about its rationale, we believe the record reflects its orally-stated determination that health and safety concerns related to the pandemic, as well as Grubb's incarceration status, justified the request and furthered that public policy.

¶25 A different conclusion is not required by our recent holding in *Strommen*, decided after completion of the briefing in this case.[1] There, the District Court granted the State's request for leave to present an expert witness's trial testimony by a video call in March 2020, just prior to full recognition of the onset of the pandemic. *Strommen*, ¶ 5. The District Court authorized the testimony due to a "scheduling conflict" with the expert witness's Tuesday night therapy sessions in Denver and other complications stemming from a potential "weather situation" in Glasgow, Montana, during the originally scheduled March 2020 trial. *Strommen*, ¶¶ 5-6. However, the trial did not commence until July 2020, during which the witness explained that she was testifying by video from a vacation home in Massachusetts, and that the Tuesday night therapy services "[were] on pause." The defendant moved for a mistrial based on the inconsistency between the stated justification supporting the video testimony and the actual circumstances. *Strommen*, ¶ 12. The District Court denied the motion, explaining that COVID-19 now presented a "huge public health crisis." *Strommen*, ¶ 13. This Court reversed, reasoning that, despite the State's COVID-based argument on appeal, "the State made no such assertion on any of the multiple occasions on which the issue arose below," and that the COVID argument was only an "opportunistic rhetorical afterthought" that had not been supported by "an adequate case-specific showing" in the district court as required by *Craig*. *Strommen*, ¶¶ 22, 25. Here, in contrast, the District Court repeatedly addressed the COVID-19 pandemic as

---

[1] Whitaker filed a Notice of Supplemental Authority on May 10, 2024, directing the Court's attention to the *Strommen* decision. *See* M. R. App. P. 12(6).

13

presenting a serious concern about securing physical testimony from Grubb. The issue was addressed several times in the year preceding the trial, and constituted a real concern, not merely a "rhetorical afterthought." These hearings included discussions that were specific to this case and Grubb's situation.

¶26 Under *Craig*'s second prong, Whitaker does not contend that two-way video systems are a generally unreliable means of receiving witness testimony, but argues that the occasions of "cutting out" in the audio and video during Grubb's testimony "broke up the flow of the questioning and potentially allowed Grubb additional time to reflect on his answer." The record does contain several instances where Grubb could not initially hear the State's or Whitaker's questions. However, in each instance, Grubb asked for the question to be repeated, and then answered it promptly. At no point did Grubb answer a question he could not hear or otherwise fail or delay to respond once he heard the question. The usual hallmarks of reliability were present, including being placed under oath, testifying in visible form such that Whitaker could see Grubb and vice versa, and being subjected to cross-examination. We conclude that the technical issues were minor in the context of the entire process of Grubb's testimony, and did not undermine the trustworthiness or validity of the testimony.

¶27 Accordingly, we conclude the District Court's authorization of the video testimony was properly justified and authenticated.

¶28 *2. Did the District Court abuse its discretion by admitting the victim's forensic interview and other statements into evidence?*

14

¶29     Whitaker argues that the District Court abused its discretion by admitting statements from L.M.'s forensic interview with Otway and examination by Wakeman into evidence. He argues that the "only arguable inconsistency" between L.M.'s prior statements and her trial testimony was that "a six-year-old girl did not remember off the top of her head whether she met briefly with two strangers when she was three . . . not what she said to them," because "[t]he *substance* of L.M.'s prior statements was entirely consistent with the *substance* of her trial testimony." (Emphasis in original.)  The State answers that L.M.'s testimony was consistent in part and inconsistent in part, but that her inability to recall extended to more than simply not recalling her meetings with these professionals, and included an inability to remember many specific details about the abuse that she had provided in her earlier statements.[2]

¶30     A prior out-of-court statement is considered non-hearsay, and therefore admissible, if "the statement is . . . inconsistent with the declarant's testimony." M. R. Evid. 801(d)(1)(A).  We have held that "a claimed lapse in memory constitutes an inconsistent statement for the purposes of M. R. Evid. 801(d)(1)(A)." *State v. Howard*, 2011 MT 246, ¶ 31, 362 Mont. 196, 265 P.3d 606 (citing *State v. Lawrence*, 285 Mont. 140, 159, 948 P.2d

---

[2] The State alternatively argues that Whitaker's defense "opened the door" to admission of the contested evidence, explaining that Whitaker contended in his opening statement that the State was desperately and unethically hiding evidence from the jury, including influences on L.M.'s testimony, such as the forensic interview and coaching to form her testimony, and in support of this theory offered an expert witness to discredit the interview.  For this reason, the State argues the accounts from the professionals were required "so the jury could determine whether, in fact, L.M. was coached" to rebut the defense.  Noting that the District Court admitted the evidence on the basis of inconsistency with L.M.'s trial testimony, the State offers this argument as a "right result, wrong reason" basis to affirm.  However, we affirm without the need to reach this issue.

15

186, 198 (1997)). We have also explained that in instances involving mixed recollection, "[a] court may admit consistent statements in conjunction with inconsistent statements where the nature of a witness's testimony makes it difficult for the court to separate the consistent from the inconsistent portions of the prior statement." *State v. Mederos*, 2013 MT 318, ¶ 18, 372 Mont. 325, 312 P.3d 438.

¶31 Whitaker's argument gives short shrift to the details that L.M., then six years old, was unable to recall at trial in comparison to the details she provided within her prior statements three years earlier. L.M. testified at trial that she did not remember where the abuse occurred, but in her interview, she explained that it occurred in the living room of her house. At trial, she could not remember how many times she had been abused, but in her interview, she indicated it was between two and four times. L.M. testified that Whitaker had used his hand and "private part" to touch her privates, and that he had called her private part her "diamond," but could not remember whether Whitaker had used a name for his private parts. In her prior statements, L.M. had stated that Whitaker also called his private part a "diamond." During L.M.'s physical examination, she told Wakeman, "Daddy pushes in and out really fast like this." No such details were recalled during her trial testimony, even when asked if she "remember[ed] talking to a nurse about what happened," and she could not recall with certainty whether Whitaker had penetrated her. L.M. could not recall at trial if anything had "come out" of Whitaker's private part, but stated in a prior statement that "blood" had come out of his "diamond." L.M. previously stated to Wakeman that Whitaker told her not to tell anyone about what was happening,

16

but she did not remember this detail at trial. Clearly, L.M.'s inability to recall details at trial extended further then merely not remembering her meetings with the professionals.

¶32 We conclude L.M.'s lack of memory extended to significant details that she had previously reported about Whitaker's abuse, constituting a material inconsistency with her prior statements under *Howard*. Given the partially consistent and partially inconsistent nature of L.M.'s testimony, the situation is more closely compared with *Mederos*, involving two sex abuse victims, seven-year-old children, who "mixed consistent statements with inconsistent ones." The repeated lapses in memory in the girls' testimony allowed the State to introduce other witnesses to testify about the girls' prior inconsistent statements. *Mederos*, ¶ 18. We therefore conclude the District Court did not abuse its discretion in permitting the professional witnesses to testify regarding L.M.'s prior statements to them.

¶33 *3. Do Whitaker's convictions of both SIWC and sexual assault violate double jeopardy as they are based upon the same act?*

¶34 Whitaker argues his convictions for SIWC and sexual assault are duplicative and therefore violate double jeopardy, protected against by both the U.S. and Montana Constitutions. *See* U.S. Const. amend. V ("[n]or shall any person be subject for the same offence to be twice put in jeopardy . . . ."); Mont. Const. art. II, § 25 ("No person shall be again put in jeopardy for the same offense previously tried in any jurisdiction."). He also cites the multiple conviction statute, § 46-11-410(2)(a), MCA, and argues the sexual assault charge is included within the SIWC charge. He asks that his sexual assault conviction be

17

reversed and dismissed. The State concedes this point, acknowledging that, at trial, the State had taken the position that all the charges were "based on the same act."

¶35 We have previously held that "§ 46-11-410(2)(a), MCA, precludes the State from convicting [the defendant] of both sexual intercourse without consent and sexual assault where the charges arose from the same attack as alleged in the information." *State v. Williams*, 2010 MT 58, ¶ 30, 355 Mont. 354, 228 P.3d 1127. Accordingly, we reverse Whitaker's conviction for sexual assault and remand for entry of an amended judgment. We affirm his other convictions.

¶36 Affirmed in part, reversed in part, and remanded to the District Court for entry of an amended judgment.


/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON